IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| DENC, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | **C.A. No. 1:18-cv-00754** |
| | ) | |
| vs. | ) | |
| | ) | |
| PHILADELPHIA INDEMNITY | ) | |
| INSURANCE COMPANY , | ) | |
| | ) | |
| Defendant. | ) | |

---

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT PHILADELPHIA'S
MOTION FOR SUMMARY JUDGMENT**

---

David L. Brown
David G. Harris II
GOLDBERG SEGALLA LLP
800 Green Valley Road, Suite 302
Greensboro, North Carolina  27408
Telephone:  336.419.4900
Email:dbrown@goldbergsegalla.com
         dharris@goldbergsegalla.com

*Attorneys for Defendant*
*Philadelphia Indemnity Insurance Company*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

NATURE OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.      The Crest at Elon Apartments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     The Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    DENC's Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.      General Principles Governing Summary Judgment . . . . . . . . . . . . . . . . . . . . . . 7

II.     DENC's Claims against Philadelphia Fail as a Matter of Law
        Because the "Loss" Was Not Covered under the Policy. . . . . . . . . . . . . . . . . . . 8

        A.      The "Loss" Is Excluded from Coverage . . . . . . . . . . . . . . . . . . . . . . . . . 9

                1.      The "Decay or Deterioration" Exclusion . . . . . . . . . . . . . . . . . . . 9

                2.      The "Defective Construction" Exclusion. . . . . . . . . . . . . . . . . . . 11

                3.      The "Long-Term Water Intrusion" Exclusion. . . . . . . . . . . . . . . 13

        B.      The "Additional Coverage – Collapse" Provision
                Does Not Provide Coverage for DENC's Claim . . . . . . . . . . . . . . . . . . 14

        C.      The "Loss" Did Not Commence During the Policy Period . . . . . . . . . . . 20

III.    DENC's Extra-Contractual Claims Fail as a Matter of Law. . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

## Cases

*6 Montague, LLC v. New Hampshire Ins. Co.*,
    122 A.D.3d 451 (N.Y. 1st Dep't 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11

*Blis Day Spa v. Hartford Ins. Group*,
    427 F.Supp.2d 621 (W.D.N.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
    155 F.3d 331 (4th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

*Dailey v. Integon Gen. Ins. Corp.*,
    75 N.C. App. 387, 331 S.E.2d 148 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

*Gray v. North Carolina Ins. Underwriting Ass'n*,
    352 N.C. 61, 529 S.E.2d 676 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24

*Herring v. Liner*,
    163 N.C. App. 534, 594 S.E.2d 117 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . .    11

*Hunter v. State Farm Fire & Cas. Co.*, No. 5:17-CV-00224,
    2019 WL 937338 (W.D.N.C. Feb. 26, 2019) . . . . . . . . . . . . . . . . . . . . . . . . .    17–18

*Imperial Textile Supplies, Inc. v. Peerless Indem. Ins. Co.*,
    2012 WL 13008425 (D.S.C. Nov. 5, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . .    20–21

*Ken E. Church & Ken E. Church Enters., LLC v. Home Fashions Int'l, LLC*,
    879 F. Supp. 2d 498 (W.D.N.C. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7–8

*Lovell v. Nationwide Mut. Ins. Co.*,
    108 N.C. App. 416, 424 S.E.2d 181 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

*Mt. Zion Baptist Church of Marietta v. GuideOne Elite Ins. Co.*,
    808 F.Supp.2d 1322 (N.D. Ga. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18–19

*Norman v. Loomis Fargo & Co.*,
    123 F.Supp.2d 985 (W.D.N.C.2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

*Old Republic Ins. Co. v. Horn*, No. 1:08CV402,
    2010 WL 3608323 (M.D.N.C. Sept. 8, 2010) . . . . . . . . . . . . . . . . . . . . . . . . .    22

*Rector St. Food Enterprises, Ltd. v. Fire & Cas. Ins. Co. of Conn.*,
    35 A.D.3d 177 (N.Y. App. Div. 1st Dept. 2006) . . . . . . . . . . . . . . . . . . . . . . . .    16

*Spartan Petroleum Co. v. Federated Mut. Ins. Co.*,
    162 F.3d 805 (4th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8

*Topsail Reef Homeowners Ass'n v. Zurich Specialties London, Ltd.*,
    11 F. App'x 225, 239 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

*Trophy Tracks, Inc. v. Massachusetts Bay Ins. Co.*,
    195 N.C. App. 734, 673 S.E.2d 787 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . .    8

*Viscosi v. Preferred Mut. Ins. Co.*,
    87 A.D.3d 1307 (N.Y. App. Div. 4th Dept. 2011) . . . . . . . . . . . . . . . . . . . . . .    22

*Wilson v. Wilson*,
    121 N.C. App. 662, 468 S.E.2d 495 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

*Woods v. Nationwide Mut. Ins. Co.*,
    295 N.C. 500, 246 S.E.2d 773 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8

## Other Authorities

FED. R. CIV. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

Black's Law Dictionary 268 (6th ed. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

Funk & Wagnalls Standard College Dictionary 271 (1968) . . . . . . . . . . . . . . . . . .    21

Pursuant to Local Rules 7.2 and 7.3 for the United States District Court for the Middle District of North Carolina, Defendant Philadelphia Indemnity Insurance Co. ("Philadelphia") submits this Memorandum of Law in Support of its Motion for Summary Judgment.

## NATURE OF THE CASE

This civil action involves claims for relief asserted by Plaintiff DENC, LLC ("DENC") arising out of DENC's claim for coverage under a commercial policy issued by Philadelphia to DENC for damage to the breezeway of a building owned by DENC. Specifically, DENC claims that coverage should be afforded because it claims that the breezeway collapsed, and the policy covers "collapse" under certain circumstances, which DENC argues apply in this case. Accordingly, DENC alleges that Philadelphia wrongfully denied coverage for its "loss", and asserts claims against Philadelphia for: (1) Breach of Contract, (2) Declaratory Judgment, (3) Breach of the Covenant of Good Faith and Fair Dealing, (4) Violation of N.C.G.S. Chapter 75, and (5) Bad Faith Denial and Handling of Claim.

However, Philadelphia properly denied DENC's claim because coverage is not afforded under the policy for the "loss" at issue. Contrary to DENC's contention, the damage to the building was not caused by an "abrupt collapse" of the breezeway as defined by the policy. Rather, as confirmed by two professional engineers who inspected the building (one retained by DENC and a second retained by Philadelphia),

23267590.v1

the breezeway did not "collapse," but rather was damaged by long-term water intrusion caused by defects in the construction of the building, which is not covered by the policy.

Accordingly, DENC's claim is not covered under the policy, and Philadelphia properly denied coverage for the "loss". Furthermore, DENC's claims for statutory and common law bad faith fail as a matter of law not only because coverage is not afforded under the policy for the "loss" at issue, but also because DENC has not come forward with evidence that Philadelphia engaged in aggravating or outrageous conduct in handling DENC's claim. Therefore, this Court should grant Philadelphia's Motion for Summary Judgment and dismiss DENC's claims, and declare that the policy does not provide coverage for the "loss" at issue.

## STATEMENT OF FACTS

**I.    The Crest at Elon Apartments.**

The Crest at Elon is an apartment complex located in Elon, North Carolina, constructed in 2004. [D.E. 2, ¶ 13]  The complex consists of four (4) three-story buildings (containing a total of 42 units) with a breezeway in the center of each building. (Dep. of Rayvon Davis, pp. 28–29)[1]   DENC purchased The Crest on November 25, 2013. (DENC's Resp. to Philadelphia's First Set of Interr., Nos. 7 and 11)[2]   DENC utilized the services of The Preiss Company ("Preiss") to manage the property, which was leased to Elon University through master lease agreements to provide housing to Elon students.

---

[1] Relevant portions of the deposition transcript of Rayvon Davis are attached as **Exhibit 1**.

[2] DENC's Response to Philadelphia's First Set of Interrogatories is attached as **Exhibit 2**.

23267590.v1

(Rule 30(b)(6) Dep. of DENC, pp. 48–50)[3] Pursuant to the terms of the Master Lease dated January 5, 2016, the entirety of The Crest complex was leased to Elon University for a term that began on August 1, 2016, and ended May 31, 2017 (Lease Year 1), and continued on August 1, 2017, and ended on May 31, 2018 (Lease Year 2).[4]

## II.     The Policy.

Philadelphia issued a commercial lines insurance policy, policy no. PHPK1737572 (the "Policy"), to DENC, effective from November 25, 2017 to November 25, 2018.[5] The Policy affords coverage for "direct physical 'loss' to Covered Property (including The Crest)" provided that the "loss" is not excluded or limited by the terms of the Policy and the "loss" commenced during the applicable policy period. (Ex. 5, pp. DENC000082, DENC00087, DENC000109, and DENC000111)

Relevant to this action, the Policy excludes "loss" caused by decay or deterioration (the "Decay or Deterioration" exclusion) or defective construction of the property (the "Defective Construction" exclusion). (Ex. 5, pp. DENC000111–DENC000115) Furthermore, pursuant to endorsement, the Policy excludes coverage for "loss" or damage caused by or resulting from continuous or repeated seepage or leakage of water, or the presence of moisture that occurs over a period of 14 days or more" (the "Long-Term Water Intrusion" exclusion). *Id.* at DENC000165–DENC000167.

---

[3] Relevant portions of the Rule 30(b)(6) deposition transcript of DENC are attached as **Exhibit 3**.

[4] A true and accurate copy of the Master Lease Agreement is attached as **Exhibit 4**.

[5] A true and accurate copy of the Policy is attached as **Exhibit 5**.

23267590.v1

The Policy also includes an "Additional Coverage – Collapse" provision that affords coverage for an "abrupt collapse", defined as "an abrupt falling down or caving in of a 'building' or any part of a 'building'". *Id.* at DENC000180–DENC000182. However, the provision states that such coverage does not apply to "a 'building' that is standing or any part of a 'building' that is standing, even if it shows evidence of cracking, bulging, sagging, ...." *Id.*

### III.   DENC's Claim.

On Monday, January 15, 2018, DENC's insurance broker (Tom Hoover with Harper Insurance) submitted a claim to Philadelphia on behalf of DENC for the "loss" at issue in this action. (Rule 30(b)(6) Dep. of DENC, pp. 79–80)[6]  It was reported to Philadelphia that the "loss" occurred on Sunday, January 14, 2018, and was described as follows: "2nd floor breezeway cracked and started to collapse.  Portion of the building is condemned by city and county officials and tenants have been put into hotel.  Engineer found water damage unknown to anyone that caused supports to rot." (Ex. 6) Three photographs of the breezeway were submitted with the claim that Mr. Hoover "took the Monday following the damage." (Rule 30(b)(6) Dep. of DENC, pp. 81–82, Ex. 18)

Philadelphia sent an email to DENC's property manager for The Crest on Tuesday, January 16, 2018, advising that it had assigned an independent adjuster (William Nunn) to investigate the loss. (Rule 30(b)(6) Dep. of DENC, pp. 144–49,

---

[6] A true and accurate copy of the Report a Claim Form is attached as **Exhibit 6**.

23267590.v1

Ex. 36) Philadelphia also sent a letter to DENC on Wednesday, January 17, 2018, acknowledging receipt of the claim. *Id.* at 144–49, Ex. 35.

Mr. Nunn made contact with Ms. Rasmunssen and scheduled an inspection of the building, which was completed on January 16, 2018. (Dep. of Nunn, p. 31, Ex. 6)[7] Based upon his inspection, Mr. Nunn advised Philadelphia that it was his opinion that "[t]he sole and proximate cause of this loss is water damage occurring over an extended period of time causing the second floor breezeway to sag and the light weight concrete finished to crack. The loss and damage was discovered on January 14, 2017 [sic]." *Id.* at 35–36, Ex. 6.

Mr. Nunn also advised Philadelphia that he was of the opinion that the "loss" would not be covered based on the application of the "Decay or Deterioration" exclusion, the "Defective Construction" exclusion, and the "Long-term Water Intrusion" exclusion. *Id.* at 31, Ex. 6. However, "in giving the insured every benefit of the doubt," Mr. Nunn recommended that Philadelphia retain a structural engineer to provide an expert opinion as to the cause of the "loss". *Id.* at 76, Ex. 6.

Philadelphia issued a letter to DENC on January 23, 2018, advising DENC that it was investigating the claim under a full reservation of rights, and that the claim may be declined based on the policy terms and conditions. *Id.* at 65, Ex. 9. Furthermore, Philadelphia retained a structural engineer, L. Steven Moore, to inspect the property and provide an opinion as to the cause of the "loss". *Id.* at 69.

_____

[7] Relevant portions of the deposition transcript of William Nunn are attached as **Exhibit 7**.

On January 30, 2018, Mr. Moore inspected the building, and subsequently issued a report to Philadelphia on February 8, 2018, opining that "the Crest apartment building has sustained significant long-term water intrusion which ultimately resulted in the wood framing (structural) member's inability to support the dead (slab) and live (occupant) loads." (Dep. of Moore, p. 45, Ex. 20)[8]  Mr. Moore further opined that construction defects (including the lack of a proper water management system and improper venting of the dryers) "resulted in long-term (approximately 14 years) of water intrusion and long-term repeated moisture exposure to the wood framing that supports the slab" and that "[t]he damage is not the result of a sudden, short-term event." *Id.*

Upon receipt of Mr. Moore's report, Philadelphia issued a letter to DENC on February 19, 2018, advising DENC that it was denying coverage for the "loss" because "the damage is reportedly the result of long-term water intrusion and deteriorated wood framing" caused by construction defects. (Dep. of Gartling, p. 3–5, Ex. 1)[9] Philadelphia referenced in its letter the "Decay and Deterioration" exclusion as well as the "Defective Construction" exclusion and "Long-term Water Intrusion" exclusion, and also advised DENC that the Policy did not cover a "loss" that did not commence during the policy period. *Id.*

---

[8] Relevant portions of the deposition transcript of L. Steve Moore are attached as **Exhibit 8**.

[9] Relevant portions of the deposition transcript of John Gartling are attached as **Exhibit 9**.

Sheldon Sam—the Rule 30(b)(6) representative for DENC—testified that he did not understand Philadelphia's reservation of rights or denial of coverage letters, but that he never took the opportunity to read the Policy either when it was issued to DENC or upon receipt of letters from Philadelphia regarding coverage for the "loss". (Rule 30(b)(6) Dep. of DENC, pp. 153–54, 170)

DENC has now filed this action seeking a declaration that coverage is afforded under the Policy for its claim because DENC alleges that "loss" involved a "collapse" that is covered under the Policy pursuant to the terms of the "Collapse – Exclusion and Additional Coverage Re-Stated" endorsement. [D.E. 2, ¶¶ 24–27]  As set forth below, the "loss" is not covered under the Policy.  Therefore, Philadelphia properly denied coverage for the "loss", and DENC's claims asserted against Philadelphia in this action—each of which is based upon the theory that Philadelphia improperly denied coverage—fail as a matter of law.

## LEGAL ARGUMENT

**I.     General Principles Governing Summary Judgment.**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  Although the initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact, once this burden is met the nonmovant may not rest on the allegations or denials in

7

its pleading, but "must come forward with specific facts showing that there is a genuine issue for trial." *Ken E. Church & Ken E. Church Enters., LLC v. Home Fashions Int'l, LLC*, 879 F. Supp. 2d 498, 503 (W.D.N.C. 2012).

The interpretation of insurance contracts is a question of law appropriately decided by motion for summary judgment. *Spartan Petroleum Co. v. Federated Mut. Ins. Co.*, 162 F.3d 805, 807–08 (4th Cir. 1998). This case hinges on the interpretation of the Policy, and so this coverage dispute is properly resolved through summary judgment.

## II. DENC's Claims against Philadelphia Fail as a Matter of Law Because the "Loss" Was Not Covered under the Policy.

Each of the claims asserted by DENC against Philadelphia is based on the theory that Philadelphia wrongfully denied coverage for the "loss" at issue. However, coverage is not afforded under the Policy for the "loss", and so Philadelphia properly denied coverage to DENC. Therefore, DENC's claims against Philadelphia fail as a matter of law.

An insurance policy is a contract, and so its provisions govern the rights and duties of the parties thereto. *See Trophy Tracks, Inc. v. Massachusetts Bay Ins. Co.*, 195 N.C. App. 734, 738, 673 S.E.2d 787, 790 (2009). Where the meaning of a policy is clear, it must be enforced as written. *Woods v. Nationwide Mut. Ins. Co.*, 295 N.C. 500, 506, 246 S.E.2d 773, 777 (1978).

In the present matter, the coverage afforded under the Policy is controlled by the Commercial Property Conditions and the Property Coverage Form in the Policy. The Commercial Property Conditions form in the Policy provides that coverage is subject

8

to certain conditions, including that the "loss" commence during the policy period. (Ex. 5, pp. DENC000082 and DENC000109). Subject to the policy conditions, the Property Coverage Form provides coverage for "direct physical 'loss' to Covered Property caused by or resulting from any of the Covered Causes of Loss." *Id.* at DENC00087. The Policy defines "Covered Causes of Loss" as risks of direct physical "loss" unless excluded or limited under the Policy. *Id.* at DENC000111. Pursuant to endorsement, the Policy also provides "Additional Coverage – Collapse" under certain circumstances.

The "loss" at issue is not covered under the terms of the Policy because: (1) the "loss" is excluded from coverage under the Policy, (2) the "Additional Coverage – Collapse" does not provide coverage for the "loss", and (3) the "loss" did not commence during the policy period. Therefore, Philadelphia properly denied coverage to DENC for the "loss", and the claims against Philadelphia (each of which is based on the theory that Philadelphia wrongfully denied coverage) fail as a matter of law.

## A. The "Loss" Is Excluded from Coverage.

### 1. The "Decay or Deterioration" Exclusion.

The Policy includes a "Decay or Deterioration" exclusion, which provides:

> **2.** We will not pay for "**loss**" caused by or resulting from any of the following:
>
> \*\*\*
>
> **d.** **(1)** Wear and tear;
>
> **(2)** Rust, corrosion, decay, deterioration, … ;

23267590.v1

(Ex. 5, pp. DENC000111–DENC000113)  Pursuant to its plain terms, this exclusion bars coverage for "loss" caused by or resulting from decay or deterioration.

Two professional engineers were retained by the parties to inspect the property. First, Mr. Moore, a professional engineer retained by Philadelphia, opined that defects in construction of the building "resulted in long-term (approximately 14 years) of water intrusion and long-term repeated moisture exposure to the wood framing that supports the slab," and documented through pictures the "long-term water intrusion and deteriorated wood framing" in the breezeway floor assembly. (Dep. of Moore, pp. 22–23 and 45, Ex. 20, PHLY000212 to PHLY000216)

During his deposition, Mr. Moore testified:

Q. And what damage was occurring from that time ["the day the building was put into operation, 14 years ago"] forward to the breezeway?

A. Continuing lack of structure of the deterioration of the framing, which supported the concrete slab. It was a continuous 14-year process that the damage, based on the water intrusion, and particularly the dryer vents, continually putting moisture-laden air into the assembly, which continued deterioration up until it was discovered.

(Dep. of Moore, pp. 66–67)

Second, John Allred, a professional engineer retained by DENC to inspect the property and prepare a protocol to dismantle and rebuild the breezeway opined:

Q. And how did you come to that determination that the damage to the trusses in the breezeway was from moisture?

A. It was similar to other jobs that I had seen in crawl spaces and where the wood had decayed and where the moisture content was, you know, high enough to cause wood to decay.

10

(Dep. of Allred, pp. 8, 36) [10]  Mr. Allred described the deterioration of the truss system as "severe", testifying that "[p]art of the trusses were completely decayed." *Id.* at 39–42.

Based upon the testimony of these professional engineers, the "loss" at issue was caused by decay or deterioration of the wood framing of the second floor assembly of the breezeway.  DENC cannot dispute this evidence.  Accordingly, the "Decay or Deterioration" exclusion bars coverage for the "loss". *See Herring v. Liner*, 163 N.C. App. 534, 538, 594 S.E.2d 117, 120 (2004) (holding that although exclusions to coverage in a policy are construed strictly to provide coverage, the court should not alter the terms of the policy under the guise of contractual interpretation when the policy provisions are clear); *see also 6 Montague, LLC v. New Hampshire Ins. Co.*, 122 A.D.3d 451 (N.Y. 1st Dep't 2014) (holding that exclusion for deterioration precluded coverage for insured-residential apartment building owner for damage sustained by sloping balcony adjacent to one of apartments where a rotting column contributed to decay in the horizontal beam that ultimately fractured).

### 2.    The "Defective Construction" Exclusion.

The Policy also includes a "Defective Construction" exclusion, which provides:

> **3.**    We will not pay for "**loss**" caused by or resulting from any of the following. But if "loss" by a Covered Cause of Loss results, we will pay for that resulting "loss."
>
> **c.**    Faulty, inadequate or defective:
>
> \*\*\*

---

[10]  Relevant portions of the deposition transcript of John Allred are attached as **Exhibit 10**.

> **(2)** Design, specifications, workmanship, repair, construction, … ;
>
>                 \*\*\*
>
> Of part or all of any property on or off the described premises.

(Ex. 5, pp. DENC000111–DENC000115)

Both engineers who inspected the breezeway also determined that the cause of the "loss" was defective construction.  Specifically, Mr. Moore opined:

> Failure to properly install a water management system on the walls, a properly integrated waterproof system for the walkway slab and framing configuration, and improper venting of the dryers have resulted in long-term (approximately 14 years) of water intrusion and long-term repeated moisture exposure to the wood framing that supports the slab.  It appears that the original building contractor and/or architect of record failed to properly install and/or detail the system to prevent this issue.

(Dep. of Moore, p. 45, Ex. 20, PHLY000216)  During his deposition, Mr. Moore stated that in addition to the defective construction of the water management system, the dryer vents improperly vented into the floor assembly, which "continually put[] moisture-laden air into the assembly." *Id.* at 65–67.  Similarly, Mr. Allred testified that the dryer vents were improperly vented, and so "[t]he vents didn't dump the moisture to the outside, but to an enclosed space" in the floor assembly. (Dep. of Allred, p. 36)

Based upon the uncontroverted evidence in this case, the "loss" was caused by defective construction.  Accordingly, the "Defective Construction" exclusion also bars coverage for "loss".

**3.**     **The "Long-Term Water Intrusion" Exclusion.**

23267590.v1

The Policy also includes the following exclusion that bars coverage for "loss" or damage caused by long-term water intrusion:

> **2.** We will not pay for "loss" or damage caused by or resulting from continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

(Ex. 5, pp. DENC000165–DENC000167)

Again, the only two engineers to have inspected the breezeway both opined that the "loss" was caused by continuous seepage of water or the presence of moisture occurring over a period of years. Mr. Moore documented in his report through pictures the "long-term water intrusion and deteriorated wood framing" in the breezeway floor, and opined that the damage was caused by "long-term (approximately 14 years) of water intrusion and long-term repeated moisture exposure to the wood framing." (Dep. of Moore, pp. 45, 66–67, Ex. 20, PHLY000212 to PHLY000216) Similarly, Mr. Allred testified that the damage to the breezeway caused by moisture more likely than not had been occurring over a period of at least a year. (Dep. of Allred, pp. 39–42)

It is anticipated that DENC will argue that the damage to the breezeway at issue occurred on January 14, 2018, when the breezeway floor cracked and deflected while a group of students was reportedly standing on the breezeway. However, as Mr. Moore pointed out during his deposition, the crack that developed and deflection of the floor was merely a continuation of the damage that had been ongoing for fourteen (14) years. Specifically, Mr. Moore testified:

23267590.v1

A. The deflection happened. You had -- already had random cracking through the concrete based on shrinkage, and for 14 years, you're putting water intrusion and dryer vents had been putting heated water -- heated air into this assembly. Deterioration had been occurring for 14 years. The loss of the structural ability of the trusses, which were the structure, had been occurring for 14 years to the point that it cracked. The concrete was a non-structural, non-reinforced slab. At some point, it likely became a suspended slab and it cracked.

\*\*\*

A. [The breezeway] had 14 years of water intrusion and deterioration. Had someone opened up that ceiling before this event, they would have closed the building then due to the observable deterioration and issues that I saw.

\*\*\*

A. … You have a total integrated structure, which is the framing with a topping slab on it, and all of it is the component. You can't separate the concrete slab from the framing. It's all integrated. The concrete slab is a topping slab supported by the frame, but it's all one item.

(Dep. of Moore, pp. 38–39, 42, 49, and 67) As a result, the damage to the breezeway was caused by long-term water intrusion and moisture that had been occurring for years, and certainly more than 14 days. As such, the "Long-Term Water Intrusion" exclusion bars coverage for the "loss".

**B.    The "Additional Coverage – Collapse" Provision Does Not Provide Coverage for DENC's Claim.**

Despite these exclusions, DENC argues that coverage should be afforded under the "Additional Coverage – Collapse" provision. However, coverage is not afforded for the "loss" under the "Additional Coverage – Collapse" provision because the "loss" does not qualify as a "collapse" as defined by the provision.

14

The "Additional Coverage – Collapse" provision provides as follows:

**D.**    **Additional Coverage – Collapse**

The coverage provided under this Additional Coverage – Collapse, applies only to an abrupt collapse as described and limited in **D.1.** through **D.7.**

**1.**    For the purpose of this Additional Coverage – Collapse, abrupt collapse means an abrupt falling down or caving in of a "**building**" or any part of a "**building**" with the result that the "**building**" or part of the "**building**" cannot be occupied for its intended purpose.

**2.**    We will pay for direct physical "**loss**" or damage to Covered Property, caused by abrupt collapse of a "**building**" or any part of a "**building**" that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused only by one or more of the following:

    **a.**    "**Building**" decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

    \*\*\*

    **d.**    Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

        **(1)**    A cause of loss listed in **2.a.** or **2.b.**;

        \*\*\*

        **(4)**    Weight of people or personal property; or

        \*\*\*

23267590.v1

**3.** This Additional Coverage – Collapse does not apply to:

    **a.** A "**building**" or any part of a "**building**" that is in danger of falling down or caving in;

    **b.** A part of a "**building**" that is standing, even if it has separated from another part of the "**building**"; or

    **c.** A "**building**" that is standing or any part of a "**building**" that is standing, even if it shows evidence of cracking, bulging, sagging, ….

(Ex. 5, pp. DENC000180–DENC000182)

DENC's argument that the "loss" is covered under the "Additional Coverage – Collapse" provision fails for two reasons. First, there was no "abrupt collapse" of the building or the breezeway. Second, the building and breezeway remained standing until dismantled by DENC, and the "Additional Coverage – Collapse" specifically states that the "Collapse" coverage does not apply to any part of a "building" that is standing, even if it shows evidence of cracking, bulging, or sagging.

Courts interpreting policy language similar to the "Additional Coverage – Collapse" provision in the Policy have applied that language to find that buildings in similar condition to the breezeway did not suffer a "collapse". *See e.g. Rector St. Food Enterprises, Ltd. v. Fire & Cas. Ins. Co. of Conn.*, 35 A.D.3d 177 (N.Y. App. Div. 1st Dept. 2006) (no coverage where the building had 2- to 3-inch wide cracks in its facade and was sinking out of plumb, and leaning, but was still standing in the hours before its demolition by its owner.

23267590.v1

For example, in *Hunter v. State Farm Fire & Cas. Co.*, No. 5:17-CV-00224, 2019 WL 937338 (W.D.N.C. Feb. 26, 2019), the insured sought coverage under its homeowners' policy, seeking coverage for damage to a wall of the home caused by decay from water intrusion under a "collapse" provision, stating that the wall was in "imminent and immediate threat of collapsing," advising State Farm that living room window header was sagging, the basement door was difficult to open due to sagging, and a piece of molding had popped off the wall. *Id.* at *1–2.

State Farm retained an engineer to inspect the "loss", who observed wood rot and staining around the windows and advised State Farm that the damage was consistent with long-term water intrusion. *Id.* As a result, State Farm denied the claim, relying on exclusions in the policy for deterioration, wet or dry rot, and defective maintenance or materials. The insured filed suit against State Farm seeking a declaration that the "loss" was covered under the policy's "collapse" provision, asserting claims for breach of contract and unfair and deceptive trade practices. *Id.*

The "collapse" provision in the *Hunter* case was similar to the provision in the Policy at issue in our case in that it defined "collapse" as "an abrupt falling down or caving in of a building or any part of a building," and did not provide coverage for a building or part of a building "that is standing … even if it shows evidence of cracking, bulging, sagging, …" or "that is in danger of falling down or caving in." *Id.* at *3. Based upon this policy language, the court held that the wall had not collapsed because

17

"the damage and deterioration of the wall occurred over several years from consistent water intrusion." *Id.* at *4.

Similarly, in *Mt. Zion Baptist Church of Marietta v. GuideOne Elite Ins. Co.*, 808 F.Supp.2d 1322 (N.D. Ga. 2011), the structural components of a church roof "failed" on March 9, 2009, due to "decay and deterioration [caused by] defective materials and method of construction." *Id.* at 1323. Following the alleged failure, a structural engineer for Mt. Zion inspected the building and found that it had "outwardly bowed sidewalls and a sagging roof" and "several of the roof rafters had collapsed and severed"; and that although the walls and roof were still standing, leaving the sanctuary standing would "constitute a hazard to people." *Id.* As a result, Mt. Zion had bracing installed, which remained until Mt. Zion had the building demolished. *Id.* at 1323–24.

Mt. Zion sought coverage under a "collapse" provision in its property policy, which similar to the "Additional Coverage – Collapse" provision in the Policy at issue in our case defined "collapse" as "the actual abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended use." *Id.* at 1325. The policy in *Mt. Zion* also provided that "a building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shirking, or expansion." *Id.* Nonetheless, Mt. Zion argued that "collapse" was ambiguous, citing multiple possible definitions of the term. *Id.*

23267590.v1

The court rejected Mt. Zion's argument, noting that Mt. Zion's own engineer admitted that the building was still standing at the time of his inspection, and although Mt. Zion's chairman testified that he was concerned that the wall was about to fall, it did not come down until Mt. Zion's contractor demolished the building. As such, the court held that the building had not collapsed. *Id.* at 1325–26.

Similar to *Hunter* and *Mt. Zion*, the "Additional Coverage – Collapse" provision in the Policy limits the coverage afforded to an "abrupt collapse"—defined as "an abrupt falling down or caving in of a "building" or any part of a "building" with the result that the "building" or part of the "building" cannot be occupied for its intended purpose. Moreover, the Policy expressly provides that coverage is not afforded for a building or any part of a building "that is standing, even if it shows evidence of cracking, bulging, [or] sagging" or "that is in danger of falling down or caving in."

As discussed *supra* **Section II.A.3**, the damage and deterioration of the breezeway occurred over many years from long-term water intrusion. As a result, the "loss" at issue does not qualify as a "collapse" under the terms of the Policy because the "loss" was not "an abrupt falling down or caving in" of the breezeway. Additionally, it is indisputable that the building and breezeway were standing at all times before DENC dismantled the breezeway to repair the decayed framing. A review of the photographs of the breezeway submitted by DENC with its claim show the breezeway was still standing. (Ex. 6) Similarly, the engineer retained by DENC testified that the breezeway floor was "sagging" but still standing when he inspected the breezeway. (Dep. of Allred,

19

pp. 21–22)  Mr. Moore also testified that the breezeway had not collapsed, but rather "[t]his was a two-and-a-half-inch concrete topping slab. It has cracking. Concrete cracks, whether it's a structural wall or a structural slab or a topping slab, it will crack. It's not a collapse." (Dep. of Moore, p. 50)

Such condition of the breezeway does not constitute a "collapse" under the Policy, which requires an abrupt falling down or caving in of part of a "building". Indeed, the Policy describes the breezeway's condition, stating that "Additional Coverage – Collapse" does not apply to a part of a building that is standing even if it shows evidence of cracking, bulging, sagging, etc. and is in danger of falling down or caving in.

## C.     The "Loss" Did Not Commence During the Policy Period.

Finally, in order for coverage to be afforded under the Policy, the "loss" must commence during the policy period. The Commercial Property Conditions in the Policy provides as follows:

> **H.     POLICY PERIOD, COVERAGE TERRITORY**
>
> \*\*\*
>
> **a.**     We cover "**loss**" commencing:
>
> > **(1)**     During the Policy Period shown in the UltimateCover Program Declarations;

(Ex. 5, pp. DENC000082 and DENC000109). The term "commence" means "to initiate by performing the first act or step" or "to begin, institute or start." *Imperial Textile Supplies, Inc. v. Peerless Indem. Ins. Co.*, No. CV 7:11-CV-00689-MGL, 2012 WL 13008425, at \*3 (D.S.C. Nov. 5, 2012) (citing Black's Law Dictionary 268 (6th ed.

23267590.v1

1990)); *see also* Funk & Wagnalls Standard College Dictionary 271 (1968) ("To start; begin; originate").

The policy period shown in the Declarations for the Policy is November 25, 2017 to November 25, 2018. (Ex. 5, p. DENC000024)  As set forth *supra* **Section II.A.3**, the damage to the breezeway had been ongoing for 14 years, beginning from the time that the building was constructed in 2004.  Therefore, the "loss" did not commence during the policy period, and the "loss" is not covered under the Policy.[11]

## III.    DENC's Extra-Contractual Claims Fail as a Matter of Law.

DENC has asserted claims against Philadelphia for statutory bad faith under North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA") as well as common law bad faith denial and handling of claim.  Each of these claims is grounded on the theory that Philadelphia breached its duty to provide coverage for the "loss".  However, as set forth above, coverage is not afforded under the Policy for the "loss", and so the extra-contractual claims fail as a matter of law. *See Old Republic Ins. Co. v. Horn*, No. 1:08CV402, 2010 WL 3608323, *5 (M.D.N.C. Sept. 8, 2010) (citing *Wilson v. Wilson*, 121 N.C. App. 662, 665, 468 S.E.2d 495, 497–99 (1996), for the proposition that "since there is no coverage, there can be no bad faith in the claims handling").  Additionally, even if the "loss" were covered under the Policy (which is denied),

---

[11] It should be noted that although counsel for DENC has not asserted a claim for coverage under prior policies issued by Philadelphia to DENC, the initial policy issued by Philadelphia to DENC became effective on November 14, 2013.  Therefore, even considering prior policies, the "loss" did not commence during the policy periods for the prior policies, and therefore, would not be covered under those policies.

23267590.v1

DENC has not come forward with evidence to support a statutory or common law bad faith claim.

In order to pursue a statutory bad faith claim under the UDTPA in the context of a breach of contract, the plaintiff must establish "substantial aggravating circumstances" attending the alleged breach. *Norman v. Loomis Fargo & Co.*, 123 F.Supp.2d 985, 989 (W.D.N.C.2000). In fact, the *Norman* court held that such a claim is unlikely in the context of a breach of contract "since [breach of contract] … claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations." It is inappropriate to "[i]mport[] tort law principles of punishment into contract" in the absence of "substantial aggravating circumstances". *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 347 (4th Cir. 1998).

In the context of a common law bad faith claim seeking punitive damages, the plaintiff must prove: (1) a refusal to pay after recognition of a valid claim, (2) bad faith, and (3) aggravating or outrageous conduct. *Lovell v. Nationwide Mut. Ins. Co.*, 108 N.C. App. 416, 424 S.E.2d 181 (1993). North Carolina courts have held that bad faith means "not based on honest disagreement or innocent mistake" and that aggravated conduct includes "fraud, malice, gross negligence, insult … willfully, or under circumstances of rudeness or oppression, or in a manner which evinces a reckless and wanton disregard of the plaintiff's rights." *Dailey v. Integon Gen. Ins. Corp.*, 75 N.C. App. 387, 331 S.E.2d 148, 154–55 (1985).

23267590.v1

When an insurer denies a claim because of an "honest disagreement" as to coverage, the insurer is entitled to judgment as a matter of law because the plaintiff cannot establish bad faith by the insurer. *Blis Day Spa v. Hartford Ins. Group*, 427 F.Supp.2d 621 (W.D.N.C. 2006); *see also Topsail Reef Homeowners Ass'n v. Zurich Specialties London, Ltd.*, 11 F. App'x 225, 239 (4th Cir. 2001) ("A disagreement between an insured and an insurer as to the validity of a claim does not transform Plaintiff's breach of contract claim into a tort for bad faith settlement").

In the present matter, DENC has not come forward with evidence of any "substantial aggravating circumstances" nor any evidence that Philadelphia refused to settle DENC's claim after recognizing that DENC had a valid claim for coverage under the Policy. To the contrary, the "loss" was not covered under the Policy. However, even if this Court were to find that DENC is entitled to coverage for the "loss", there was (at least) an "honest disagreement" between the parties as to whether the "loss" was covered, and there is no forecast of evidence that Philadelphia denied DENC's claim after recognizing that DENC had a valid claim for coverage. In fact, the evidence in this case is that Philadelphia acted promptly in responding to DENC's submission of its claim by immediately investigating the claims, sending a prompt letter to DENC reserving rights under the policy, and promptly investigating the loss under that reservation of rights. Although the parties may disagree on the question of whether coverage is afforded under the Policy, there is no evidence that Philadelphia had anything other than an "honest disagreement" as to the validity of DENC's claim. Therefore, even

23267590.v1

if DENC were entitled to coverage under the Policy for the "loss" (which is denied), DENC's statutory and common law bad faith claims fail as a matter of law.

Furthermore, the Supreme Court of North Carolina has held that "in order to recover treble damages, a plaintiff must show that he 'suffered actual injury as a proximate result of defendant's deceptive statement or misrepresentation.'" *Gray v. North Carolina Ins. Underwriting Ass'n*, 352 N.C. 61, 74–75, 529 S.E.2d 676, 684–85 (2000) (holding that the trial court could not have properly trebled the breach of contract damages). DENC has not come forward with evidence of any damages that resulted from any alleged statutory bad faith conduct separate from the damages arising from Philadelphia's alleged breach of the Policy by denying coverage to DENC for the "loss". (Ex. 2, Interr. No. 5; Rule 30(b)(6) Dep. of DENC, pp. 94, 179–83, Ex. 13) Therefore, DENC's statutory bad faith claim also fails because DENC has not come forward with evidence that it suffered damages as a proximate result of Philadelphia's alleged unfair or deceptive conduct beyond breach of contract damages.

## <u>CONCLUSION</u>

For the reasons set forth above, Philadelphia respectfully requests that this Court grant its motion for summary judgment, and declare that DENC was not entitled to coverage under the Policy for the claim at issue in this action, and dismiss the claims asserted by DENC against Philadelphia in this action.

23267590.v1

Respectfully submitted this the 1st day of July, 2019.

GOLDBERG SEGALLA LLP

/s/ David L. Brown
David L. Brown (N.C. State Bar No. 18942)
David G. Harris II (N.C. State Bar No. 35327)
800 Green Valley Road, Suite 302
Greensboro, North Carolina  27407
Telephone:  336.419.4910
Email: dbrown@goldbergsegalla.com
dharris@goldbergsegalla.com

*Attorneys for Defendant*
*Philadelphia Indemnity Insurance Company*

23267590.v1

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.3(d), counsel for the Defendant Philadelphia Indemnity Insurance Company certifies that the foregoing brief, which was prepared using 13-point proportionally-space font, specifically Times New Roman, contains fewer than 6,250 words, including the body of the brief, headings, and footnotes, but excluding the caption, signature lines, certificate of service, and any cover page or index, as reported by the word-processing software.

Respectfully submitted this the 1st day of July, 2019.

**GOLDBERG SEGALLA LLP**

/s/ David L. Brown
David L. Brown (N.C. State Bar No. 18942)
David G. Harris II (N.C. State Bar No. 35327)
800 Green Valley Road, Suite 302
Greensboro, North Carolina 27407
Telephone: 336.419.4910
Email: dbrown@goldbergsegalla.com
        dharris@goldbergsegalla.com

*Attorneys for Defendant*
*Philadelphia Indemnity Insurance Company*

26

## CERTIFICATE OF SERVICE

I hereby certify that on this date, a copy of the foregoing Memorandum of Law in Support of Defendant Philadelphia's Motion for Summary Judgment was filed electronically with the Clerk of Court using the Court's CM/ECF system. Parties may access this filing through the Court's system. Notice of this filing will be sent by operation of the Court's CM/ECF system to the following counsel of record.

<table>
<tr><td>John E. Branch III<br>Andrew Brown<br>SHANAHAN LAW GROUP, PLLC<br>128 E. Hargett Street, Suite 300<br>Raleigh, North Carolina 27601<br>Telephone: 919.856.9494<br>jbranch@shanahanlawgroup.com<br>abrown@shanahanlawgroup.com<br><em>Attorneys for Plaintiff DENC</em></td><td>Gregg E. McDougal<br>Denton Worrell<br>McDOUGAL WORRELL, LLP<br>316 W. Edenton Street, Suite 100<br>Raleigh, North Carolina 27603<br>Telephone: (919) 893-9500<br>gregg@mcdougalworrell.com<br>denton@mcdougalworrell.com<br><em>Attorneys for Plaintiff DENC</em></td></tr>
</table>

This the 1st day of July, 2019.

**GOLDBERG SEGALLA LLP**

/s/ David L. Brown
David L. Brown (N.C. State Bar No. 18942)
David G. Harris II (N.C. State Bar No. 35327)
800 Green Valley Road, Suite 302
Greensboro, North Carolina 27407
Telephone: 336.419.4910
Email: dbrown@goldbergsegalla.com
          dharris@goldbergsegalla.com

*Attorneys for Defendant*
*Philadelphia Indemnity Insurance Company*

27