# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
### 1:18-CV-00754

DENC, LLC,                              )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )
                                        )
PHILADELPHIA INDEMNITY                  )
INSURANCE COMPANY, TOKIO                )
MARINE NORTH AMERICA,                   )
INC., D/B/A PHILADELPHIA,               )
                                        )
                    Defendants.         )


## PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT


NOW COMES Plaintiff DENC, LLC, ("Plaintiff" or "DENC"), by and through undersigned counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7.3, hereby submits this Brief in Support of Plaintiff's Motion for Partial Summary Judgment (the "Motion"). In support of its Motion, Plaintiff shows the Court as follows:

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

NATURE OF THE MATTER .................................................................................. 1

STATEMENT OF FACTS ....................................................................................... 2

QUESTIONS PRESENTED ..................................................................................... 13

STANDARD OF REVIEW ...................................................................................... 13

ARGUMENT .......................................................................................................... 14

    I.  In violation of part (a) of section 58-63-15(11), Defendant
    misrepresented Policy provisions relating to coverage at issue. ..................... 15

    II.  In violation of part (d) of section 58-63-15(11), Defendant refused
    to pay DENC's Claim without conducting a reasonable investigation
    based upon all available information. .............................................................. 16

    III.  In violation of part (n) of section 58-63-15(11), Defendant failed
    to provide a reasonable explanation of the basis in the insurance
    policy in relation to the facts or applicable law for denial of a claim. ............ 17

    IV.  In violation of part (g) of section 58-63-15(11), Defendant
    compelled DENC to institute this litigation to recover amounts
    due under the Policy. ...................................................................................... 18

    V.  DENC's Motion should be granted, and the award of attorney's fees
    is warranted in this case. ................................................................................ 23

CONCLUSION ....................................................................................................... 24

# TABLE OF AUTHORITIES

<u>Statutes</u>

N.C. Gen. Stat. 58-3-1 (2017)…………………………………………………………13
N.C. Gen. Stat. § 75-1.1 (2017)……………………………………………………….14
N.C. Gen. Stat. § 58-63-15(11) (2017)………………………………………………..14
N.C. Gen. Stat. § 75-16.1 (2017)……………………………………………………...23

<u>Case Law</u>

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)……………………………..13
*Avis v. Hartford Fire Ins. Co.*, 195 S.E.2d 545, 545 (N.C. 1973)……………………….19
*Barker v. Iowa Mut. Ins. Co.*, 85 S.E.2d 305, 307 (N.C. 1955)……………………...18, 22
*Continental Cas. Co. v. Amerisure Ins. Co.*, 886 F.3d 366, 371 (4th Cir. 2018)…….13, 23
*Country Club of Johnston Cty., Inc. v. U.S. Fid. & Guar. Co.*, 563 S.E.2d 269,
279 (N.C. Ct. App. 2002)……………………………………………………………...15
*Erie Ins. Exchange v. Bledsoe*, 540 S.E.57, 60 (N.C. Ct. App. 2000)……………..…19, 23
*Grant v. Emmco Ins. Co.*, 243 S.E.2d 894, 897 (N.C. 1978)……………………………18
*Gray v. N.C. Ins. Undewriting Ass'n,* 529 S.E.2d 676, 681 (N.C. 2000)……………14, 15
*High Country Arts & Craft Guild v. Hartford Fire Ins. Co.*, 126 F. 3d 629, 635
 (4th Cir. 1997)………………………………………………………………...……15
*Marshall v. Miller*, 276 S.E.2d 397, 403 (1981)………………………………………14
*Se. Airmotive Corp. v. U.S. Fire Ins. Co.*, 337 S.E.2d 167, 169 (N.C. Ct. App. 1985)….18
*Sec. Ins. Grp. of Hartford v. Parker*, 210 S.E.2d 741, 741 (N.C. Ct. App. 1975……..3, 19
*State Capital Ins. Co. v. Nationwide Mut. Ins. Co.*, 350 S.E.2d 66, 68 (N.C. 1986)…….18
*Wachovia Bank & Tr. v. Westchester Fire Ins. Co.*, 172 S.E.2d 518, 522 (N.C. 1970)…19
*Wash. Hous. Auth. v. N.C. Hous. Auths. Risk Retention Pool*, 502 S.E.2d 626,
628 (N.C. Ct. App. 1998)…………………………………………………………..18

<u>Rules</u>

Fed. R. Civ. P. 56(a)…………………………………………………………………..13

## NATURE OF THE MATTER

Under well-established North Carolina law, an insurance carrier is prohibited from conducting unfair claim settlement practices with its insureds. Such prohibited acts include, failing to provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim, misrepresenting pertinent facts or provisions of the insurance policy, and compelling the insured to institute litigation to recover amounts due under the policy. Any one of these acts is a violation of North Carolina's Unfair and Deceptive Trade Practices Act as a matter of law.

Here, following the collapse of a breezeway at DENC's student apartment housing complex during a large gathering, Plaintiff promptly filed a claim on its policy with Defendant Philadelphia Insurance Company ("Defendant" or "Philadelphia"). Thereafter, in a letter from Defendant's headquarters, Defendant's Senior Claims Examiner expressly stated that the claim would be paid. Shortly thereafter, in another letter, sent from Philadelphia's Colorado office, a different insurance adjuster, who did not inspect the property or speak with any witnesses, denied coverage. Remarkably, in his denial letter, Defendant's Colorado adjuster provided no analysis as to which parts of the policy justified the denial of coverage based on the facts. Instead, Defendant purported to quote numerous coverage exclusions—which in fact were incorrect, did not exist, and/or were not even a part of the policy—and omitted sections of the policy that modified those exclusions to provide coverage. Defendant admitted that it denied coverage based on policy exclusions that did not even apply or were deleted in their entirety by endorsements to the policy. Such acts are wrongful as a matter of law.

1

As explained further below, Defendant's actions are an impermissible attempt to confuse its insured about what language of the policy was operative and obfuscated its contractual obligation to provide coverage for DENC's claim. Given the policy provided for coverage for the collapse of the breezeway at issue here, and that Defendant's actions constituted various prohibited insurance settlement practice acts, DENC is entitled to summary judgment on its Chapter 75 claim, declaratory action, and breach of contract claim.

## STATEMENT OF FACTS

DENC owns a student-housing apartment complex in Elon, North Carolina, known as The Crest at Elon (the "Crest"). (Compl. ¶ 13 (ECF No. 2); Ans. ¶ 13 (ECF No. 14)). The Crest is comprised of four buildings, each of which contain apartments that can accommodate four student occupants. (Compl. ¶ 15; Ans. ¶ 15). Building 2020, which is at issue here, is a three-story building, with four apartments on each floor. (Compl. ¶ 16; Ans. ¶ 16). On the second floor is an outside central breezeway (the "Breezeway"), which provides access to the four apartments on that floor. (Compl. ¶ 17; Ans. ¶ 17; *see* Ex. A, Depo. of J. Kirby, at 46(5-7)).

DENC purchased a commercial lines property insurance policy, numbered PHPK1737572 (the "Policy," attached as Exhibit B), for the period of November 25, 2017 to November, 25, 2018, (Compl. ¶ 20; Ans. ¶ 20), which covered Building 2020, (Compl. ¶ 22; Ans. ¶ 22). The Policy was an "all risks" policy, providing coverage for all risks

unless they were expressly excluded.[1]  The Policy included an endorsement for "collapse" (the "Collapse Endorsement," attached as Exhibit C).

On January 14, 2018, at about 1:12AM, during a large gathering of people on the Breezeway, the Breezeway collapsed.  (*See* Ex. D, Surveillance Video; Ex. E, Aff. of S. Taromian).  Surveillance cameras located at the ends of the stairwells leading down from the second floor Breezeway to the ground floor showed **over 110 people** immediately leaving Building 2020 at the time of the collapse.  (*See* Ex. D, Surveillance Video).

Early that morning, January 14, 2018, two reporters arrived at the Crest to investigate.  (Ex. F, Decl. of E. Harrison, at ¶ 7; Ex. G, Decl. of J. Pascale, at ¶ 8).  One reporter stated, in part:

> I saw the damage to Building 2020 first-hand. There was a large amount of debris on the ground underneath the damaged breezeway and what remained appeared hanging down more than one (1) foot.
> . . . .
>
> During my investigation and reporting of the story, I interviewed residents of the building.  In these interviews, I learned that there had been a party on the second floor of Building 2020 that night and that attendees at the party had started jumping in the breezeway when a certain song had started playing. During the jumping, the floor abruptly collapsed underneath the students, causing panic. The party quickly dissipated after that point.

---

[1] The Policy stated: "Covered Causes of Loss means Risks of Direct Physical Loss unless the "loss" is: 1. Excluded in Section B., Exclusions; or 2. Limited in Section C., Limitations." (Ex. B, Policy, at PHLY0114).  The insurance carrier has the burden of proof to establish an exclusion from coverage.  *See Sec. Ins. Grp. of Hartford v. Parker*, 210 S.E.2d 741, 741 (N.C. Ct. App. 1975).

(Ex. F, Decl. of E. Harrison, at ¶¶ 9-10). The other reporter confirmed the same. (Ex. G, Decl. of J. Pascale, at ¶¶ 9-11).

Building 2020 was condemned until the Breezeway could be rebuilt. (Ex. H, Def.'s Produc. (Adjuster Nunn), at PHLY0220). As Defendant's engineer, Mr. Steven Moore, later stated: "NO one should be permitted to access any unit from the breezeway due to the significant amount of damage." (Ex. I, Moore Email, at 1 (emphasis in original)). When asked, "Q In your opinion, was the breezeway structurally sound when you visited on January 30th, 2018? [Moore:] No." (Ex. J, Depo. of S. Moore, at 42(2-5)).

On January 15, 2018, DENC notified Defendant of the damage to the Breezeway. (Compl. ¶ 32; Ans. ¶ 32), initiating its insurance claim. On January 16, 2018, Defendant engaged an independent adjuster, who inspected the Breezeway that same day. (Ex. K, Nunn Report, at 1).

On January 25, 2018, Defendant approved coverage for DENC in a letter (the "January 25 Letter") by stating, in pertinent part: "We have issued, or will be issuing payment to you, or on your behalf, for damages or injuries sustained under the above claim number." (Ex. L, January 25 Letter, at 1). The January 25 Letter was signed by Ms. Wilson-Williams, Senior Claims Examiner for Defendant, (*id.*), from Philadelphia's home office.

Thereafter, Defendant learned that it could not subrogate DENC's claims because the statute of repose had expired. (Ex. M, Nunn Report 2, at PHLY0302).

On February 19, 2018, DENC received a letter from a different adjuster of Defendant denying coverage for the Claim (the "Denial Letter"). (Ex. N, Denial Letter).

4

The Denial Letter was signed by Mr. John W. Gartling, Senior Property Claim Specialist, (*id.* at 8), located at Defendant's Colorado office, (Ex. O, Depo. of J. Gartling, at 46). Mr. Gartling held licenses in Wyoming and New Mexico, but not in North Carolina. (*Id.* at 47). He did not interview a single witness. (*Id.* at 35(23-24)). He did not talk to any students or find out how many of them were in the Breezeway. (*Id.* at 36(22-25)). In fact, he did not even visit the Crest site. (*Id.* at 35(25)-36(1)).

The Denial Letter did not revoke, reference, or even mention Defendant's January 25 Letter accepting coverage. Thus DENC had two conflicting letters, one approving coverage and one denying coverage—neither of which has been withdrawn, revoked, or modified to date.

The Denial Letter began by listing observations, including the following: "Mr. Moore's[2] conversations with Mr. Davis[3] indicated that the partial slab displacement occurred on Sunday, January 7,[4] when allegedly a large number of students were in the breezeway." (Ex. N, Denial Letter, at 1). The Denial Letter went on to state: "With these details of the investigation received, we reviewed the coverage afforded under the policy contract PHPK1737572, which was issued to you by the Philadelphia Indemnity Insurance Company. In our review of this Contract, we have found the following Exclusions and/or

---

[2] Defendant's hired expert.

[3] Maintenance person for the Crest property manager.

[4] The date appears to be a typo.

Limitations within the Policy within the Policy Form PI-ULT-0081198:" (*Id.* at 2 (emphasis added and removed)).

The Denial Letter did not provide an explanation as to how or why the Exclusions and Limitations[5] were related to the facts or applicable law in denying DENC's Claim. (*Id.*, at 2-5). The Denial Letter cited numerous Exclusions and/or Limitations that were inapplicable, irrelevant, <u>materially</u> modified, or even <u>deleted in their entirety</u> by other parts of the Policy, and omitted the language that provided coverage to the insured, (*id.*):

> **i.** Collapse, except as provided below in the Additional Coverage for Collapse. But if **"loss"** by any of the Covered Causes of Loss results at the described premises, we will pay for that resulting **"loss"**.

(Ex. N, Denial Letter, at 3). However, under an endorsement to the Policy "Section B. Exclusions, 2.i. is <u>deleted in its entirety</u>." (Ex. C, Collapse Endorsement, at 1 (emphasis added)). Even though it had been deleted in its entirety, Mr. Gartling relied on this exclusion to deny coverage. When asked about this deleted provision, he stated:

> [Gartling:] As I said, there's individual sections of the policy that apply, and all those combined form the basis of the denial.
>
> Q So this combined with the other sections form the basis of your denial?
>
> [Gartling:] Yes.

---

[5] There is no meaningful difference between Exclusions and Limitations; both are exclusions from coverage under the Policy. (Ex. P, Depo. of R. Groff, at 37-47).

6

(Ex. O, Depo. of J. Gartling, at 7(10-15)).

The Denial Letter omitted the very portion of the Policy that provided coverage for "collapse" (under the Collapse Endorsement), which stated in part:

> (a) To the extent that coverage is provided under the Additional Coverage – Collapse; or
>
> (b) To collapse caused by one or more of the following:
>
>> (i) The "specified causes of loss";
>> (ii) Breakage of building glass;
>> (iii) Weight of rain that collects on a roof; or
>> (iv) <u>Weight of people</u> or personal property.

(Ex. C, Collapse Endorsement, at 1 (emphasis removed and added)).

For another example, the Denial Letter quoted Section B Exclusion 2(d)(2), which excluded coverage for "**(2)** Rust, corrosion, fungus, decay . . . ." (Ex. __, Denial Letter, at 3). However, an endorsement to the Policy states: "Exclusion **2.d. (2)** is <u>deleted in its entirety</u>." (Ex. B, Policy, at PHLY0170 (emphasis added)).

For another example, remarkably, the Denial Letter quoted Exclusion 3.g. for "flood" <u>as a basis for denying coverage</u>, (Ex. N, Denial Letter, at 3), even though there was no evidence of flood. Mr. Gartling's deposition revealed:

> Q:      And where did -- is there any information whatsoever that showed that the flooding -- that that property was flooded?
>
> [Gartling:]    I don't believe so.
>
> . . . .
>
> Q:      So you just decided to put that in?

7

| [Gartling:] | Yes. I wasn't sure if flood had anything to do with it. |
|---|---|
| Q: | And that was part of the basis of your denial, correct? |
| [Gartling:] | It's stated there, yes. |

(Ex. O, Depo. of J. Gartling, at 25(25)-26(3), 26(16-21)). When John Kirby, Vice President of Claims, who reviewed and signed off on the Denial Letter, (Ex. Q, Def.'s Interrog. Resp., at 11(¶ 6)), was asked about "flood" during Defendant's Rule 30(b)(6) deposition, Mr. Kirby answered that flood had nothing to do with this claim, (Ex. A, Depo. of J. Kirby, at 28(7-9)).

For another example, the Denial Letter quoted the Limitation 1.a. for "steam boilers, steam pipes, steam engines or steam turbines," (Ex. N, Denial Letter, at 3-4), even though there was no evidence of steam boilers ever being located at the Crest. When Gartling was questioned,

| Q | And there were no steam boilers at that property, correct? |
|---|---|
| [Gartling:] | I don't know. |
| Q | You don't know? |
| [Gartling:] | I don't know. |
| Q | Well, you used that language. |
| [Gartling:] | I did, yeah. |

(Ex. O, Depo. of J. Gartling at 18(11-15), 19(16-19)). When Mr. Kirby was questioned during Defendant's Rule 30(b)(6) deposition: "Q. And then you go on, Limitations, and

8

steam boilers, steam pipes, steam engines, steam turbines, do they have anything to do with this case? [Kirby:] No. Steam boilers don't." (Ex. A, Depo. of J. Kirby, at 39(6-10)).

Making matters even worse, the Limitation 1.a. for "steam boilers, steam pipes, steam engines" that the Denial Letter quoted had been expressly deleted from the Policy in another section. (Ex. B, Policy, at PHLY0163 ("For the purposes of this endorsement, the following exclusions and limitations, or parts thereof, are deleted as respects to the Boilers, Pressure Vessels and Machinery and Equipment at the described premises: . . . Limitation C.1.a . . . ." (emphasis added)). Not only did Defendant admittedly cite and rely on the steam boiler Limitation without any evidentiary basis, but the Limitation had been deleted from the Policy altogether.

For another example, the Denial Letter quoted the Limitation C.1.b for "Hot water boilers or other water heating equipment . . . ." (Ex. N, Denial Letter, at 4). Though the Denial Letter quoted this language as an exclusion without any factual basis, it failed to recognize that the Limitation C.1.b had been deleted from the Policy. (Ex. B, Policy, at PHLY0163 ("For the purposes of this endorsement, the following exclusions and limitations, or parts thereof, are deleted as respects to the Boilers, Pressure Vessels and Machinery and Equipment at the described premises: . . . Limitation C.1.b . . . ." (emphasis added)). Mr. Gartling admitted that the Limitation had been deleted from the Policy. (*See* Ex. O, Depo. of J. Gartling, at 24(9-15)).

For another example, the Denial Letter quoted the Limitation C.1.c for "The interior of any 'buildings' . . . ." (Ex. N, Denial Letter, at 4 (emphasis removed)). However, the "interior" was inapplicable in this case, as the Breezeway was open to the outside and not

9

enclosed. Mr. Kirby, who reviewed and approved the Denial Letter, stated during Defendant's Rule 30(b)(6) deposition:

> Q.        And do you consider this the interior of a building?
>
> [Kirby:]  Would I consider the interior building what, what the interior of the building?
>
> Q.        The breezeway.
>
> [Kirby:]  The breezeway, probably not. I mean, is it -- a breezeway makes it sound like it's like a -- just like a bridge area.

(Ex. A, Depo. of J. Kirby, at 45-46).

For another example, the Denial Letter quoted the Exclusion language from the Collapse Endorsement Section "D. Additional Coverage – Collapse," stating:

> With respect to D. Additional Coverage - Collapse that coverage is amended to read:
>
> 1. This Additional Coverage - Collapse does not apply to:
>
> a. A "building" or any part of a "building" that is in danger of falling down or caving in;
>
> b. A part of a "building" that is standing, even if it has separated from another part of the "building"; or
>
> c. A "building" that is standing or any part of a "building" that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

(Ex. N, Denial Letter, at 4-5 (emphases removed)). However, the Denial Letter omitted the portion from the same Section D. Additional Coverage – Collapse that provided coverage:

1. For the purpose of this Additional Coverage – Collapse, abrupt collapse means an <u>abrupt falling down or caving in</u> of a "building" or any part of a "building" with the result that the "building" or part of the "building" cannot be occupied for its intended purpose.

2. We will pay for direct physical "loss" or damage to Covered Property, caused by abrupt collapse of a "building" or any part of a "building" that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused only by one or more of the following:

a. "Building" decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse; . . . .

d. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

> (1) A cause of loss listed in 2.a. or 2.b.;
> (2) One or more of the "specified causes of loss";
> (3) Breakage of "building" glass;
> (4) <u>Weight of people</u> or personal property; or
> (5) Weight of rain that collects on a roof.

(Ex. C, Collapse Endorsement, at 1-2 (emphases removed and added)).

For another example, the Denial Letter then quoted an Exclusion for " 'Fungus', Wet Rot, Dry Rot And Bacteria," (Ex. N, Denial Letter, at 5). Remarkably, though the Denial Letter relied on that exclusion, it came from some other policy altogether. (Ex. O, Depo. of J. Gartling, at 29(6-7). When Mr. Kirby was asked during the Rule 30(b)(6) deposition of Defendant: "Q. John Gartling stated, John Gartling, that the fungus quotation was taken from the wrong policy. Are you aware of that? [Kirby:] Yes, I was aware." (Ex. A, Depo. of J. Kirby, at 59(15-19)).

Defendant relied on the above-stated Exclusions and Limitations in denying DENC's claim. (Ex. O, Depo. of J. Gartling, at 5). When asked: " Q And you used those clauses to determine there's no coverage, correct? [Gartling:] That's the basis of the denial, yes." (*Id.*).

Without stating how such Exclusions and Limitations applied to DENC's claim, and without citing the language that provided coverage for DENC's claim, and despite having already sent DENC the January 25 Letter approving coverage, the Denial Letter stated:

> <u>We trust your understanding that our coverage position is clear</u> with respect to this letter. However, should you disagree with our position, please promptly communicate your notice of disagreement to the undersigned in writing. Having adequately considered the detailed reasoning for our no coverage position on this issue, we request you describe the basis for your disagreement so we can provide to you an adequate reply and/or re-evaluation of that position.

(Ex. N, Denial Letter, at 5 (emphasis added)).

Given the conflicting letters from Defendant, the confusing, misquoted, and in applicable exclusions, some of which were deleted in their entirety, even one exclusion that was from some other policy altogether, and the omissions of coverage language applicable to DENC's claim, DENC, in a lengthy and detailed letter, notified Defendant of its basis for disagreement with Defendant's denial and requested payment. (Ex. R, Demand Letter). Nonetheless, Defendant failed to provide "an adequate reply or re-evaluation of th[eir] position," (Ex. N, Denial Letter, at 6), forcing DENC to initiate this suit.

As Mr. Kirby revealed during the Rule 30(b)(6) deposition of Defendant:

> Q.        And do you often just don't respond at all?

| [Kirby:] | We always -- I mean, we always respond if we're -- we always -- you know, we're required to respond and say, we agree or we still disagree, or there may be an alternative like we want to understand more. |
|---|---|
| Q. | But you have to respond; isn't that correct? |
| [Kirby:] | That's correct. |
| . . . . | |
| Q. | But a response was not made as required, correct? |
| [Kirby:] | A response -- to my knowledge, a response was not -- was not -- there was no response until after, of course, suit was filed on the 30th. |

(Ex. A, Depo. of J. Kirby, at 57(24), 58(1-7), 59(4-8)).

## QUESTIONS PRESENTED

Whether there is a genuine dispute as to any material fact that (1) Defendant's actions in denying DENC's claim violated Chapter 75 of the North Carolina General Statutes, and (2) that the collapse of the Breezeway was covered under the Policy.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine dispute of material fact remains. But a non-moving party must establish more than the "mere existence of a scintilla of evidence" to support his position. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 252 (1986).  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* at 249-50.

North Carolina law applies because this case arose under this Court's diversity jurisdiction and the Policy covered property sited in North Carolina.  N.C. Gen. Stat. 58-3-1 (2017); *see Continental Cas. Co. v. Amerisure Ins. Co.*, 886 F.3d 366, 371 (4th Cir. 2018).

## ARGUMENT

Chapter 75 of the North Carolina General Statutes prohibits unfair and deceptive trade practices by anyone engaged in commerce, including insurance carriers.  N.C. Gen. Stat. § 75-1.1 (2017).  To establish a violation of Chapter 75, a plaintiff must show: (1) an unfair or deceptive trade or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiff.  *See Gray v. N.C. Ins. Undewriting Ass'n*, 529 S.E.2d 676, 681 (N.C. 2000).  "[A] practice is deceptive if it has the capacity or tendency to deceive; proof of actual deception is not required."  *Marshall v. Miller*, 276 S.E.2d 397, 403 (1981).  A plaintiff is not required to demonstrate bad faith.  *Id.* ("[U]nlike statutes enacted by some of our sister states, there is no explicit statutory requirement of a showing of bad faith in G.S. 75-1.1.").  Intent and whether the defendant acted in good faith are irrelevant.  *Id.* ("Good faith is not a defense to an alleged violation of G.S. 75-1.1.").

Within the broad ambit of Chapter 75, insurance companies are specifically prohibited from conducting certain unfair claim settlement practices with their insureds under Chapter 58.  *See* N.C. Gen. Stat. § 58-63-15(11) (2017).  In particular, section 58-63-15(11) prohibits:

14

a.      Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;
. . . .

d.      Refusing to pay claims without conducting a reasonable investigation based upon all available information;
. . . .

g.      Compelling [the] insured to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insured;
. . . .

n.      Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

*Id.* (brackets in original).

If an insurance carrier commits any one of the above prohibited acts in dealing with its insured, such an act "constitutes a violation of N.C.G.S. § 75-1.1 as a matter of law." *Gray*, 529 S.E.2d at 683; *Country Club of Johnston Cty., Inc. v. U.S. Fid. & Guar. Co.*, 563 S.E.2d 269, 279 (N.C. Ct. App. 2002); *see also High Country Arts & Craft Guild v. Hartford Fire Ins. Co.*, 126 F. 3d 629, 635 (4th Cir. 1997) (noting "proof of unfair claims practices does constitute per se proof of an unfair or deceptive practice under N.C. Gen. Stat. § 75-1.1").

The prohibition of certain settlement practices is not limited to the conduct prescribed in Chapter 58; the broader standards of conduct prohibited by Chapter 75 apply to insurance carriers as well. *See Gray*, 529 S.E.2d at 683. Thus, an insurance carrier may

be liable for any wrongful act that violates Chapter 75, even if that act is not specifically identified in Chapter 58. *See id.*

## I. In violation of part (a) of section 58-63-15(11), Defendant misrepresented Policy provisions relating to coverage at issue.

There is no dispute that Defendant misrepresented the Policy provisions relating to the coverage here. In an apparent attempt to avoid payment of a covered claim, Mr. Gartling and Mr. Kirby admitted that they sent a Denial Letter replete with exclusions that were materially modified or were even deleted in their entirety by other parts of the Policy, including collapse exclusion 2.i, exclusion 2.d.(2), steam boiler limitation c.1.a, and hot water boiler limitation c.1.b. (*E.g.*, Ex. A, Depo. of J. Kirby, at 39(6-10); Ex. O, Depo. of J. Gartling, at 25-26; *see supra* at 6-9). Defendant admitted to relying on these exclusions as a basis for its denial. (Ex. O, Depo. of J. Gartling, at 5).

There is no dispute the Denial Letter quoted and relied on completely irrelevant exclusions. Defendant admitted during 30(b)(6) deposition that the exclusions for "flood," "steam boilers," and the "interior" had nothing to do with this case. (Ex. A, Depo. of J. Kirby, at 28(7-9), 39(6-10), 45-46). Yet Defendant wrongfully included them in its Denial Letter as a basis for denying DENC's claim.

There is no dispute that Defendant cited numerous exclusions to coverage, but omitted the Policy language that provided coverage. The Denial Letter quoted the exclusion 2.i for collapse, but failed to mention the exceptions to that exclusion that provided coverage, as well the coverage afforded under the Additional Coverage -- Collapse, (*see* supra at 6-7), as explained further below.

16

**II.     In violation of part (d) of section 58-63-15(11), Defendant refused to pay DENC's Claim without conducting a reasonable investigation based upon all available information.**

For example, there is no dispute that Defendant quoted, included, and relied on the "flood" exclusion without having conducted any investigation to support it.  Mr. Gartling admitted that he did not inspect the site, did not interview one person, and had no evidentiary basis to include the "flood" exclusion.  (Ex. O, Depo. of J. Gartling, at 25-26, 35-36).  He stated that he "wasn't sure if flood had anything to do with it," but just decided to put in the exclusion anyway.  (*Id.* at 26).

As another example that supports a violation of part (d), there is no dispute that Defendant included and relied on the "steam boiler" exclusion, without any evidentiary basis to include it, as there were no steam boilers at the Crest.  (*Id.* at 18-19).  Defendant even quoted and inserted one exclusion that was from some other policy altogether.  (*Id.* at 29).  Nonetheless, Defendant included all of these exclusions in its Denial Letter anyway.

**III.    In violation of part (n) of section 58-63-15(11), Defendant failed to provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim.**

There is no dispute that Defendant failed to provide any reasonable explanation (or any explanation at all) as to how or why the numerous Exclusions and Limitations that the Denial Letter quoted related to the facts or applicable law resulting in the denial of DENC's Claim.  The Denial Letter stated that Defendant "found the following Exclusions and/or Limitations within the Policy," (Ex. N, Denial Letter, at 2), but proceeded to quote random, irrelevant, incorrect, and deleted exclusions from coverage, as set forth above.

Importantly, the Denial Letter fails to acknowledge coverage within the Policy, as Ms. Wilson-Williams did in Philadelphia's January 25 Letter approving coverage. (*See* Ex. L, January 25 Letter). The Denial Letter never revokes, references, mentions, or discusses Defendant's January 25 Letter accepting coverage and to date, both letters remain outstanding—one approving coverage, and one denying coverage. Remarkably, Defendant's Rule 30(b)(6) designee Mr. Kirby, who reviewed and approved the Denial Letter before it went out, admitted that he was not even aware of the January 25 Letter approving coverage until having been notified by DENC's response letter or the initiation of this suit. (Ex. A, Depo. of J. Kirby, at 65(17-24).

IV.    **In violation of part (g) of section 58-63-15(11), Defendant compelled DENC to institute this litigation to recover amounts due under the Policy.**

The collapse is covered, as explained further below. Given Defendant's conflicting letters—one approving coverage, one denying coverage, and that Defendant failed to provide an adequate reply to DENC's letter that provided its basis of disagreement and DENC's request for payment, Defendant impermissibly compelled DENC to initiate the instant action.

In North Carolina, insurance coverage is reviewed under special rules of construction that go beyond the basic contract interpretation principles. These special rules of construction do not only construe ambiguous terms against the insurance carrier, like a typical contract analysis, but rather encompass a great deal more in favor of policyholders:

- **"[W]herever possible, the policy will be interpreted in a manner 'which gives, but never takes away, coverage.' "** *Wash. Hous. Auth. v. N.C. Hous. Auths. Risk Retention Pool*, 502 S.E.2d 626, 628 (N.C. Ct. App. 1998) (internal citation omitted).

18

- Provisions extending coverage **"must be construed liberally so as to provide coverage, whenever possible by reasonable construction."** *State Capital Ins. Co. v. Nationwide Mut. Ins. Co.*, 350 S.E.2d 66, 68 (N.C. 1986).

- **"Exclusions from liability are not favored, and are to be strictly construed against the insurer."** *Se. Airmotive Corp. v. U.S. Fire Ins. Co.*, 337 S.E.2d 167, 169 (N.C. Ct. App. 1985).

- **"[P]rovisions which exclude liability of insurance companies are not favored and therefore all ambiguous provisions will be construed against the insurer and in favor of the insured."** *State Capital Ins. Co.*, 350 S.E.2d at 68.

- **"[I]f the language used in the policy is reasonably susceptible of different constructions, it must be given the construction most favorable to the insured, since the company prepared the policy and chose the language."** *Grant v. Emmco Ins. Co.*, 243 S.E.2d 894, 897 (N.C. 1978) (citation omitted).

- **An excluded peril must be the sole cause of damages for the damage to be excluded.** *Erie Ins. Exchange v. Bledsoe*, 540 S.E.57, 60 (N.C. Ct. App. 2000).

The meaning of language in an insurance policy is a question of law for the Court. *Wachovia Bank & Tr. v. Westchester Fire Ins. Co.*, 172 S.E.2d 518, 522 (N.C. 1970). "When the insurer asserts non-liability under an exception or exclusion in the policy, once a Prima facie case of liability under the policy is established, the burden of proof is upon the insurer to establish that the loss falls within the exception or exclusion asserted." *Sec. Ins. Grp. of Hartford v. Parker*, 210 S.E.2d 741, 741 (N.C. Ct. App. 1975). Here the Policy is an "all risks" policy, meaning the Policy covers all risks unless expressly excluded. *See* note 1, *supra*; *see also Avis v. Hartford Fire Ins. Co.*, 195 S.E.2d 545, 545 (N.C. 1973) (describing all risks policies). Accordingly, Defendant has the burden of proof to establish that DENC's loss falls within an exclusion in the Policy.

DENC's claim for collapse of the Breezeway is covered under two parts of the Collapse Endorsement: Section B and Section D. First, the collapse is covered under

19

Section B because the collapse was caused by "weight of people" during the large party on the Breezeway. The collapse is also covered under Section D, "Additional Coverage – Collapse," as further shown below.

Section B of the Collapse Endorsement begins by stating an exclusion for collapse, but then carves out several scenarios to which coverage for collapse is provided, as follows:

> I. Section B. Exclusions, 2.i. is deleted in its entirety and replaced with the following:
>
> i. Collapse, including any of the following conditions of property or any part of the property:
>
>> (1) <u>An abrupt falling down</u> or caving in;
>>
>> (2) <u>Loss of structural integrity</u>, including separation of parts of the property or property in danger of falling down or caving in; or
>>
>> (3) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to (1) or (2) above.
>
> But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the "loss" or damage caused by that Covered Cause of Loss.
>
> **<u>This exclusion i. does not apply:</u>**
>
>> **(a)** To the extent that coverage is provided under the Additional Coverage – Collapse; **or**
>>
>> **(b)** To **collapse caused by** one or more of the following:
>>
>>> (i) The "specified causes of loss";
>>> (ii) Breakage of building glass;
>>> (iii) Weight of rain that collects on a roof; or
>>> (iv) **Weight of people** or personal property.

20

(Ex. D, Collapse Endorsement, at 1 (emphases removed and added)).  Thus coverage is afforded for a "collapse caused by" "weight of people."

"Collapse" is not a defined term in the Policy *per se*, however, as shown above, the Policy does provide for three examples.  *See United States v. Hawley*, No. 18-4167, __ F. Supp. 3d __, __ (4th Cir. Mar. 26, 2019) (The term "including" is "an introductory term for an incomplete list of examples." (emphasis removed) (internal citations omitted)).  As stated above, "collapse" includes any of the following:

> (1) An abrupt falling down or caving in;
>
> (2) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; **or**
>
> (3) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to (1) or (2) above.

(Ex. C, Collapse Endorsement, at 1 (emphasis added)).  Mr. Gartling, confirmed that any of the above scenarios qualified as a "collapse" under the Policy.  (Ex. O, Depo. of J. Gartling, at 30(24)-31(1-2) ("Q So you would agree -- because it says including, so that would be three examples of collapse, but not all types of collapse, correct?  [Gartling:] Yes.")).

There is no dispute that there was a "collapse" as set forth the Policy's express examples above, caused by "weight of people."  The investigation by reporter Harrison revealed that the Breezeway "abruptly" fell during a large party, and it fell "down more than one (1) foot," and thus an "abrupt falling down" occurred.  (Ex. F, Decl. of E. Harrison, at ¶¶ 9-10).  News reporter Pascale's investigation revealed the same.  (Ex. G, Decl. of J.

Pascale, at ¶¶ 10-11).    Defendant's own expert, Mr. Moore, admitted that the Breezeway dropped "downward," stating it was "obvious."  (Ex. J, Depo. of S. Moore, at 44(17-21)).[6] Mr. Moore also found that the breezeway was not "structurally sound," (*id.* at 42), and thus a loss of structural integrity occurred.   The surveillance video showed that <u>110 people</u> immediately left the Breezeway.   Even Defendant's own expert opined that the damage resulted from the Breezeway's inability to support the "live (occupant) loads" (i.e. weight of people).   (Ex. S, Moore Report, at PHLY0216).   Therefore there was a covered "collapse," as exemplified in Section B.

If Philadelphia wanted to require that a collapse required something falling "to the ground," it could have stated so, but did not.   *See Wash. Hous. Auth.*, 502 S.E.2d at 628. Furthermore, Defendant's 30(b)(6) designee, Robert Groff, who testified to the "Drafting of the Crest Policy" and the "forms and other endorsements," (Ex. P, depo. of R. Groff, at 7), confirmed that it was not necessary for the Breezeway to have completely fallen to the ground:

> Q.        And you said it has to hit the ground?
>
> [Groff:]    No, it just says falling down or caving in.
>
> Q.        So it doesn't have to go to the ground, does it?
>
> [Groff:]     Not necessarily.

(*Id.* at 70(3-7)).

---

[6] Even after the independent adjuster Nunn first visited the Breezeway, he characterized it as a "collapse."  (Ex. J, Depo. of S. Moore, at 14(14-18)).

22

Though Defendant's Denial Letter failed to provide an explanation as to how or why the numerous Exclusions and Limitations that the Denial Letter quoted related to the facts or applicable law resulting in the denial of DENC's Claim, it's possible Defendant claims a construction defect contributed. Nonetheless, the "use of defective material or methods in construction" are covered under Section D, Additional Coverage – Collapse. (*See* Ex. C, Collapse Endorsement, at 2 (Part 2(d)). Building decay is also covered under the Collapse Endorsement. (Ex. C, Collapse Endorsement, at 2).

Even if Defendant contends that another cause, including but not limited to construction defect, also contributed, under North Carolina law, coverage "will not be denied where there is more than one cause of an injury and only one of the causes is excluded." *Continental Cas. Co. v. Amerisure Ins. Co.*, 886 F.3d 366, 371 (4th Cir. 2018) (citation omitted). An excluded peril must be the sole cause of damages for the damage to be excluded. *Erie Ins. Exchange v. Bledsoe*, 540 S.E.57, 60 (N.C. Ct. App. 2000).

## V. DENC's Motion should be granted, and the award of attorney's fees is warranted in this case.

DENC paid substantial premiums on the Policy. As set forth above, Defendant admitted that they put language in the Denial Letter that contained deleted Policy language, exclusions that had nothing to do with their denial, and omitted the language that provided coverage. Defendant sent the Denial Letter after having learned that subrogation was not available, as the statute of repose had expired. (Ex. M, Nunn Report 2, at PHLY0302). Defendant's "profits" are the real number one goal. (*See* Ex. P, Depo. of R. Groff, at 74(22)).

Even another Philadelphia examiner independently disagreed and sent DENC the January 25 Letter approving the claim, as the Policy provides coverage. That Letter has not been revoked, and thus Defendant has already admitted coverage. DENC is entitled to be paid.

This is a simple case—Philadelphia wrote an indefensible Denial Letter. DENC expressly notified Defendant of its disagreement with its denial, but Defendant failed to provide an adequate reply to the letter. Accordingly, in conjunction with its Motion, and pursuant to section 75-16.1, and for the reasons set forth herein, DENC respectfully requests that this Court grant its Motion and that the Court award its reasonable attorney's fees. *See* N.C. Gen. Stat. § 75-16.1 (2017).

## CONCLUSION

Accordingly, DENC requests this Court grant its Motion and find that coverage was afforded for the Breezeway collapse under Plaintiff's declaratory action claim, that Defendant breached the insurance contract, that Defendant's conduct violated Chapter 75, and award Plaintiff its damages, interest, and reasonable attorneys' fees, to be determined at the proper time.

This the 1st day of July, 2019.

McDOUGAL WORRELL LLP

By:     */s/ Gregg E. McDougal*

        */s/ H. Denton Worrell*

Gregg McDougal, NCSB # 27290

24

H. Denton Worrell, NCSB # 49750
316 West Edenton Street, Suite 100
Raleigh, North Carolina 27603
Telephone: (919) 893-9500
gregg@mcdougalworrell.com
denton@mcdougalworrell.com
*Attorneys for Plaintiff*




**SHANAHAN McDOUGAL, PLLC**

By:    /s/ *Andrew D. Brown*
John E. Branch III, NCSB # 32598
Andrew D. Brown, NCSB # 45898
128 E. Hargett Street, Third Floor
Raleigh, North Carolina 27601
Telephone: (919) 856-9494
Facsimile: (919) 856-9499
jbranch@shanahanlawgroup.com
*Attorneys for Plaintiff*

25

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 7.3(d) of the Local Rules of Practice and Procedure for the United States District Court for the Middle District of North Carolina, the undersigned certifies that Plaintiff's Brief in Support of Its Motion for Partial Summary Judgment complies the limitation on length of briefs set forth in the Rule.

This the 1st day of July, 2019.

**McDOUGAL WORRELL LLP**

By:     */s/ Gregg E. McDougal*

*/s/ H. Denton Worrell*
Gregg McDougal, NCSB # 27290
H. Denton Worrell, NCSB # 49750
316 West Edenton Street, Suite 100
Raleigh, North Carolina 27603
Telephone: (919) 893-9500
gregg@mcdougalworrell.com
denton@mcdougalworrell.com
*Attorneys for Plaintiff*

26

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Plaintiff's Brief in Support of Its Motion for Partial Summary Judgment was filed this the 1st day of July, 2019 with the Clerk of Court using the CM/ECF system. Parties may access this filing through the Court's Electronic Filing System. Notice of this filing will be sent to the following counsel of record by operation of the Court's Electronic Filing System:

> David L. Brown
> David G. Harris, II
> Goldberg Segalla LLP
> 800 Green Valley Road
> Suite 302
> Greensboro, NC  27408

This the 1st day of July, 2019.

McDOUGAL WORRELL LLP

By:    */s/ Gregg E. McDougal*

*/s/ H. Denton Worrell*
Gregg McDougal, NCSB # 27290
H. Denton Worrell, NCSB # 49750
316 West Edenton Street, Suite 100
Raleigh, North Carolina 27603
Telephone: (919) 893-9500
gregg@mcdougalworrell.com
denton@mcdougalworrell.com
*Attorneys for Plaintiff*