IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| DENC, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:18-CV-754 |
| | ) | |
| PHILADELPHIA INDEMNITY | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

On January 14, 2018, there was a party at an apartment complex owned by DENC, LLC, and leased to Elon University. During the party, the concrete-floored breezeway supported by wooden beams and connecting the second-floor apartments in one of the buildings suddenly shifted downward by roughly one foot; the concrete flooring cracked; debris and part of the breezeway fell; and over one hundred students quickly left the building. The applicable provisions in DENC's insurance contract with Philadelphia Indemnity Insurance Company cover this kind of collapse, and no exclusions apply. Summary judgment on the coverage and breach of contract issues will be granted in favor of DENC and against Philadelphia. The motions for summary judgment related to other claims will be resolved by separate order as time permits.

## BACKGROUND

In 2013, DENC purchased The Crest at Elon, an apartment complex built in 2004. Philadelphia issued a commercial lines insurance policy to DENC for "direct physical

loss" to The Crest, if the loss commenced during the relevant policy period. The policy at issue here covered November 25, 2017, to November 25, 2018. As an "all-risk" policy, it covers risks unless they are expressly excluded or limited by the policy itself. *See* Doc. 32-8 at 112 ("Covered Causes of Loss means Risks of Direct Physical Loss unless the 'loss' is: 1. Excluded in Section B., Exclusions; or 2. Limited in Section C., Limitations; that follow."); Doc. 34-16 at 11–12.

Building 2020, the building at issue, has four apartments on each of three stories, with the overall capacity for forty-eight residents. Doc. 2 at ¶ 16; Doc. 14 at ¶ 16. In the early morning hours on January 14, 2018, a large number of students gathered on the second-floor breezeway of Building 2020 for a party. According to resident statements, party attendees "started jumping in the breezeway when a certain song had started playing," and "the floor abruptly collapsed underneath the students." Doc. 34-6 at ¶ 10; *see also* Doc. 34-7 at ¶ 11.[1]

Surveillance video, depicting two stairways on different sides of Building 2020, shows that from 1:12 to 1:16 a.m. on January 14, some 100 people left the building. Some walked quickly downstairs, but others walked at a normal speed, talking with other people or looking at their phones. A few students went back upstairs, but—at least until the 1:20 am cutoff of the video provided—the vast majority of students did not return to the second floor. The surveillance video does not show the second-floor breezeway itself. *See* Doc. 34-4 (notice of manual filing of video); Doc. 34-5.

---

[1] There was no hearsay or other objection raised to the Court's consideration of this evidence.

Another video, titled "Elon Student Video," shows a cell phone recording of a young man jumping on a crack in a concrete pathway, which Philadelphia states is Building 2020's second-floor breezeway after the January 14 event. *See* Doc. 37 (notice of manual filing of video); Doc. 36 at 7–8.[2] The video shows only that second-floor view; it does not show the exterior of or underneath the breezeway.

Two student reporters viewed the breezeway the morning after the party. In their testimony, each characterized what happened to the building as a "collapse." Doc. 34-6 at ¶¶ 7–10; Doc. 34-7 at ¶¶ 7, 9–10. They each observed that part of the breezeway had fallen to the ground, and the rest was hanging down at least one foot. Doc. 34-6 at ¶ 9; Doc. 34-7 at ¶¶ 9–10. They each saw a significant amount of debris on the ground below the second-floor breezeway, and a large hole in the ceiling of the first-floor breezeway. Doc. 34-6 at ¶ 9; Doc. 34-7 at ¶¶ 9–10. Philadelphia has not disputed these facts.[3]

After the January 14 events, DENC immediately notified Philadelphia. Doc. 2 at ¶ 32; Doc. 14 at ¶ 32. Philadelphia retained an adjuster, William Nunn, who inspected the breezeway on January 16. *See* Docs. 32-6, 32-11. A few days later, Mr. Nunn wrote to Philadelphia that "[t]he sole and proximate cause of this loss is water damage occurring over an extended period of time causing the second floor breezeway to sag and the light weight concrete finished [*sic*] to crack." Doc. 32-11 at 3. Although he noted that "an

---

[2] The video itself does not indicate the time, date, or location of filming, nor who filmed it and who is portrayed, nor was any authentication evidence provided. But there was no objection to the Court's consideration of this video.

[3] The record does not contain photographs of the exterior or underneath the breezeway.

area of the 2nd floor breezeway was cracking and sagging," *id.*, he did not further describe the extent of the damage.

By January 16, 2018, the building had been condemned. Doc. 34-8. Mr. Nunn retained a structural engineer, Steven Moore, to assess the breezeway. Doc. 32-12 at 1. Mr. Moore visited The Crest on January 31 and issued his report on February 8. Doc. 32-14 at 2, 4. He catalogued multiple ways in which water had seeped into the breezeway's wood framing and photographed the resulting biological growth and wood decay. Doc. 32-14 at 4–12. He did not describe the damage to the breezeway's exterior, such as the distance it had fallen down or any resulting debris on the ground, though he subsequently testified that "it's obvious, visual to see that . . . the area that dropped, [is] lower than it would have been left in a usable condition." Doc. 34-10 at 14.

In his report, Mr. Moore concluded that the building "has sustained significant long-term water intrusion which ultimately resulted in the wood framing (structural) member's inability to support the dead (slab) and live (occupant) loads." Doc. 32-14 at 12. As the wood-frame "structural elements of the breezeway" had deteriorated, the concrete slab lacked the support it required—and once it became a "suspended" slab, it could no longer "carry weight." Doc. 34-10 at 13. Mr. Moore attributed this water intrusion to the "[f]ailure to properly install a water management system on the walls, a properly integrated waterproof system for the walkway slab and framing configuration, and improper venting of the dryers." Doc. 32-14 at 12. He opined, therefore, that "[t]he damage is not the result of a sudden, short-term event." *Id.* He advised that no one should use the breezeway in its current condition. *Id.* at 13.

4

DENC retained an engineer, Steven Allred, who did not issue a report but who testified that the breezeway was sagging because the concrete had broken. Doc. 32-17 at 11. The damaged second-floor breezeway was "supported by the remaining structure underneath it." *Id.* at 12. Like Mr. Moore, he did not describe how far it had fallen down or how much of it was attached to the building. Mr. Allred also concluded that the damage to the breezeway's supporting wood trusses was due to moisture from the dryer vents, which vented "to an enclosed space" rather than outside the building. *Id.* at 13.

Philadelphia eventually denied coverage for DENC's losses. This case followed.

## GENERAL LEGAL PRINCIPLES

The parties agree that North Carolina law applies in interpreting the insurance contract between DENC and Philadelphia. DENC, as the insured, "has the initial burden of bringing itself within the insuring language of the policy." *John S. Clark Co., Inc. v. United Nat'l Ins. Co.*, 304 F. Supp. 2d 758, 764 (M.D.N.C. 2004) (quoting *Hobson Constr. Co., Inc. v. Great Am. Ins. Co.*, 71 N.C. App. 586, 590, 322 S.E.2d 632, 635 (1984)).[4] "[T]he burden then shifts to the insurer to prove that a policy exclusion excepts the particular injury from coverage." *Alliance Mut. Ins. Co. v. Dove*, 214 N.C. App. 481, 483, 714 S.E.2d 782, 784 (2011). "Recovery will be allowed under a policy affording 'all risks' coverage for all losses of a fortuitous (external) nature not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding loss from coverage. The term 'all risks' is not to be given a restrictive meaning."

---

[4] The Court omits internal citations, alterations, and quotation marks throughout this opinion, unless otherwise noted. *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

*Cleveland Const., Inc. v. Fireman's Fund Ins. Co.*, 819 F. Supp. 2d 477, 481 (W.D.N.C. 2011) (quoting *Avis v. Hartford Fire Ins. Co.*, 283 N.C. 142, 146, 195 S.E.2d 545, 547 (1973)).

The interpretation of language in an insurance policy is a question of law for the courts. *Guyther v. Nationwide Mut. Fire Ins. Co.*, 109 N.C. App. 506, 512, 428 S.E.2d 238, 241 (1993). Courts construe any ambiguities in insurance contract provisions against the insurer. *Markham v. Nationwide Mut. Fire Ins. Co.*, 125 N.C. App. 443, 454, 481 S.E.2d 349, 356 (1997); *see also Guyther*, 109 N.C. App. at 512, 428 S.E.2d at 241. Indeed, the fact that the parties cannot agree on the meaning of a particular term in a policy "is some evidence that a term is ambiguous," and so "is the fact that courts in various jurisdictions have a difference of opinion regarding what definition to give a policy term." *Id.* Moreover, "as our courts are not favorably disposed toward provisions limiting the scope of coverage, exclusions are to be strictly construed to provide the coverage which would otherwise be afforded by the policy." *Markham*, 125 N.C. App. at 454, 481 S.E.2d at 356.

## THE POLICY LANGUAGE

It is undisputed that the loss here is excluded by several exclusions in the policy.[5] That is not the end of the question, however, as the policy contains an endorsement entitled "Collapse – Exclusion and Additional Coverage Re-stated." Doc. 32-8 at 181–

---

[5] Philadelphia has asserted that the loss here is excluded under the "decay or deterioration" exclusion, the "defective construction" exclusion, and the "long-term water intrusion" exclusion, *see* Doc. 32 at 13–18, and DENC has not contended otherwise. *See* Doc. 38. The dispute thus focuses on whether coverage is available under the Collapse Endorsement.

83. That provision both provides coverage in certain circumstances and excludes coverage in others, in a confusing morass of definitions, exclusions, and exceptions.

Like many insurance policies, the policy here includes provisions that are elsewhere deleted and modified. While there is language about "collapse" in the body of the policy, it is later deleted in favor of the Collapse Endorsement at issue here.[6]

The Collapse Endorsement begins with exclusions of coverage for "collapse, including an abrupt falling down or caving in."[7] Doc. 32-8 at 181 at § I(B)(2)(i)(1). Later on the same page, however, it says that "if collapse results in a Covered Cause of Loss, we will pay for the loss," and specifically provides that the exclusion "does not apply to collapse caused by weight of people or personal property," Doc. 32-8 at 181 at § I(B)(2)(i)(b)(iv), and that the exclusion does not apply "to the extent that coverage is provided under the Additional Coverage – Collapse." Doc. 32-8 at 181 at § I(B)(2)(i)(a). The referenced "Additional Coverage – Collapse" language follows, and it provides coverage "only" for "an abrupt collapse," defined as "an abrupt falling down or caving in

---

[6] In the body of the policy, it excludes coverage for "collapse, except as provided below in the Additional Coverage for Collapse." Doc. 32-8 at 115. In the "Additional Coverage – Collapse" provision, coverage is provided for loss "caused by or resulting from risks of direct physical 'loss' involving collapse of 'buildings' or any part of 'buildings' caused only by" specific listed events, including hidden decay and weight of people or personal property. Doc. 32-8 at 118. Later in the policy, however, there is an endorsement labelled "Collapse – Exclusion and Additional Coverage Restated," Doc. 32-8 at 181, which deletes both the original exclusion for collapse, Doc. 32-8 at 115, and the "Additional Coverage – Collapse" provision, Doc. 32-8 at 118, and replaces those provisions with other language, as well as adding additional terms related to "collapse." Doc. 32-8 at 181–83.

[7] To facilitate ease of reading, the Court has not included ellipses to mark deletion of irrelevant materials, nor has the Court noted changes in capitalization made necessary by context.

of a 'building' or any part of a 'building' with the result that the 'building' or part of the 'building' cannot be occupied for its intended purpose." § II(D)(1).

Having excluded coverage for "abrupt" "collapse" in § I(B)(2)(i)(1), and then given back coverage for "abrupt collapse" in § II(D)(1), the Additional Coverage section of the Collapse Endorsement again takes it away in some situations or limits it in others. § II(D)(2), II(D)(3). In § II(D)(2), the Collapse Endorsement provides coverage for loss "caused by abrupt collapse of a 'building' or any part of a 'building' if such collapse is caused only by one or more of the following," including:

> a. "Building" decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;
> . . .
> d. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:
>> (1) A cause of loss listed in 2.a.;
>> . . . or
>> (4) Weight of people or personal property.

Section II(D)(2). Neither "cause" nor "caused by" is defined in the Definitions section of the policy, Doc. 32-8 at 35 at § IV; *see also id.* at 112–22, and neither party has directed the Court's attention to any other place in the 183-page policy where the word "caused" or the phrase "caused by" are defined.

Under § II(D)(3), Philadelphia further restricts covered losses, stating that the Additional Coverage – Collapse "does not apply to":

> a. A "building" or any part of a "building" that is in danger of falling down or caving in;
> b. A part of a "building" that is standing, even if it has separated from another part of the "building"; or

  c. A "building" that is standing or any part of a "building" that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

Doc. 32-8 at 182 at § II(D)(3).

  Finally, Philadelphia's policy covers "'loss' commencing" during the relevant policy period and defines "loss" as "accidental loss or damage." Doc. 32-8 at 110, 111 at §§ F(4)(a)(1), G(7). Neither party has directed the Court's attention to any place in the policy where the word "commencing" is defined.

  The upshot of this meandering quagmire, as is relevant here, is:

I.  Coverage is available only under the Collapse Endorsement;

II.  Coverage is available under the Collapse Endorsement if there is a collapse resulting in a covered loss, which commenced during the policy period,

  **AND**:

  A. the collapse is caused by weight of people, § I(B)(2)(i)(b)(iv), **OR**

  B. (1) at least part of the building fell down abruptly, with the result that the building could not be occupied for its intended purpose, § II(D)(1), **AND**

    (2) the collapse was caused

      (a) by building decay that is hidden from view, § II(D)(2)(a), **OR**

      (b) by use of defective methods in construction if the collapse is caused in part by weight of people, § II(D)(2)(d);

  **BUT**

    (3) Coverage is excluded if the building or the relevant part thereof is:

      (a) standing **OR**

9

(b) in danger of falling down or caving in. § II(D)(3).

## DISCUSSION

As noted, the Collapse Endorsement says that "if collapse results in a Covered Cause of Loss, we will pay for the 'loss' or damage caused by that Covered Cause of Loss." Doc. 32-8 at 181 (after § I(B)(2)(i)(3) and before § I(B)(2)(i)(a)). DENC has presented evidence of a collapse. Residents said that after party attendees "started jumping in the breezeway . . . the floor abruptly collapsed underneath the students." Doc. 34-6 at ¶ 10; *see also* Doc. 34-7 at ¶ 11. Two student reporters who observed the breezeway just a few hours after the party stated that it had fallen at least one foot, with significant debris and a part of the breezeway on the ground. Philadelphia has not disputed these observations with either photographs or descriptions from others who viewed the damage. Other circumstantial evidence supports the view that there was a collapse. DENC has met its initial burden to show coverage.

The burden thus falls on Philadelphia to show an exclusion applies, but Philadelphia has not met its burden. One, it was a collapse caused by the weight of people. Two, it was an abrupt collapse of part of a building caused by building decay, and that part of the building is not standing. Three, it was an abrupt collapse of part of a building caused by defective methods in construction and by the weight of people, and that part of the building is not standing.

## I.     Weight of People

The Collapse Endorsement excludes coverage in several situations potentially applicable here, but that exclusion "does not apply" and coverage is thus provided if the

10

collapse was "caused by" the "weight of people." Doc. 32-8 at 181 at § I(B)(2)(i)(b)(iv). It is not completely clear if this is an exception to an exclusion, as Philadelphia contends, or simply a clarification of the extent of the exclusion, as DENC contends.

The Court need not spend much time on this conundrum, for three reasons. First, the ambiguity as to whether it is an exception to the exclusion or simply part of the scope of the exclusion is construed against Philadelphia. *See Markham*, 125 N.C. App. at 454, 481 S.E.2d at 356. Second, where, as here, "reasonable people could conclude that the claimed loss is covered by language anywhere in the policy or the amendatory endorsements, the insured has carried his burden as concerns an 'all-risks' policy. Any other construct would merely encourage insurers to orchestrate a shell game of exclusions and exceptions to exclusions." *Betz v. Erie Ins. Exch.*, 957 A.2d 1244, 1256–57 (Pa. Super. Ct. 2008).[8] Finally, even if it is an exception to an exclusion and DENC has the burden of proof,[9] DENC has met the burden to show that the exception applies.

_____

[8] Pennsylvania law as recited in this opinion appears to be similar in relevant part to North Carolina law.

[9] Philadelphia maintains § I(B)(2)(i)(b)(iv) is an exception to an exclusion, which does not afford coverage at all, Doc. 39 at 6, or for which DENC bears the burden of proof. Doc. 42 at 8. *See Hartford Cas. Ins. Co. v. Gelshenen*, 387 F. Supp. 3d 634, 639 (W.D.N.C. 2019) (citing *Home Indem. Co. v. Hoechst Celanese Corp.*, 128 N.C. App. 189, 202, 494 S.E.2d 774, 783 (1998)) (insured has burden to demonstrate that an exception to an exclusion exists and applies). Some of Philadelphia's cited cases do not concern all-risk policies, and the relevant analysis differs in this context. *See Avis*, 283 N.C. at 146, 195 S.E.2d at 547. Although *Alwart v. State Farm Fire & Casualty Company*, 131 N.C. App. 538, 539–40, 508 S.E.2d 531, 532–33 (1998), appears to address an all-risk policy—"any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered"—the court there evaluated a claim for the indirect effects of an excluded loss, which the plaintiffs contended were "ensuing losses." That question is not before this Court.

DENC has presented circumstantial evidence that the collapse was at least partially caused by the weight of people. The breezeway fell while a larger than usual number of people were standing, jumping, and dancing on it, not during the years before when a smaller number of people lived in the building without apparent incident. This is circumstantial evidence that the weight of people caused the floor to collapse at the moment it did. And Mr. Moore, the structural engineer, noted that the wood framing could not "support the dead (slab) and live (occupant) loads," Doc. 32-14 at 12, which seems to mean weight of people, and that the concrete slab could no longer "carry weight." Doc. 34-10 at 13.

This part of the policy requires that the collapse be "caused by one or more of the following," including weight of people, which contemplates that a listed event need only be a partial cause. It does not state that the collapse must have been caused *only* by one of the listed factors. Had Philadelphia intended to require a factor to be the sole cause of a collapse for it to be covered under § I(B)(2)(i)(b), it could have written the policy accordingly. *Cf.* Causes of Loss § B(1), Doc. 32-8 at 112 (policy language excluding some causes of loss "regardless of any other cause or event that contributes concurrently or in any sequence to the 'loss'"). Even if the causation standard were ambiguous, it would be strictly construed against the insurer. *State Capital Ins. Co. v. Nationwide Mut. Ins. Co.*, 318 N.C. 534, 547, 350 S.E.2d 66, 73–74 (1986) ("We agree with the Court of Appeals decision" that "strictly construed the standard of causation" arising out of an ambiguous phrase in a homeowners policy.).

Philadelphia has not pointed to any evidence establishing that the party-goers' weight did not play at least a partial causative role in causing the breezeway to collapse when it did. In fact, Mr. Nunn did not assess their role at all. *See* Doc. 32-10 at 8 (Nunn agreed with statement that whether the students—the "live load"—caused the damage "had nothing to do" with his investigation).

The January 14 event was a collapse caused by the weight of people. Thus it falls outside the exclusions in § I(B)(2)(i), and coverage is available under § I(B)(2)(i)(b)(iv).

Philadelphia asserts that other exclusions in the policy—for decay or deterioration, defective construction, and long-term water intrusion—bar coverage for this damage. Doc. 32 at 13–18; Doc. 39 at 6; Doc. 42 at 4. That may be so, *see supra* note 5, but the weight of people also contributed to causing the January 14 collapse, so the Collapse Endorsement provides coverage. To the extent Philadelphia is arguing that of the conflicting provisions, the exclusions prevail, the Court rejects that argument. *See State Capital Ins. Co.*, 318 N.C. at 547, 350 S.E.2d at 74 ("[W]hen an accident has more than one cause, one of which is covered by an 'all risks' insurance policy and the other which is not, the insurer must provide coverage."); *see also Anderson v. Cincinnati Ins. Co.*, No. 1:12–156–HMH, 2013 WL 445998, at *5–6 (W.D.N.C. Feb. 5, 2013) (quoting *Carlson v. Old Republic Ins. Co.*, 160 N.C. App. 399, 402, 585 S.E.2d 497, 499 (2003)) ("When an endorsement provision can be construed as in direct conflict with the coverage provisions of the policy, the provisions most favorable to the insured . . . are controlling." ).

## II.     The Abrupt Collapse

Even if coverage is not available under the "weight of people" provision, it is available under Section II of the Collapse Endorsement.  DENC has shown there was an abrupt falling down with the result that the building could not be occupied, and the collapse was caused by either "building decay" or "defective methods in construction" plus the weight of people.  Doc. 32-8 at 181–82 at § II(D)(1), (2)(a), (2)(d).  Philadelphia has not shown any exclusions apply.

### A. **Building Could Not Be Occupied.**

Building 2020 was condemned shortly after January 14, and the parties agree that its residents could not live there until after the breezeway was repaired.  Accordingly, the building could not "be occupied for its intended purpose."  While there may have been several reasons the building could not be occupied, one of those reasons surely was because the second-floor breezeway had collapsed:  Philadelphia's engineer explicitly said no one should use the breezeway to access the apartments until the breezeway was repaired.  Doc. 32-14 at 13; *see also* Doc. 34-9.

### B. **Abrupt Falling Down.**

The evidence shows that the breezeway suddenly and without warning collapsed, falling down at least a foot from its normal position during the party, to a degree that caused many dozens of people to leave in a short period of time.  Just a few hours later, part of the breezeway was on the ground, along with a lot of ceiling and floor debris.  Residents characterized it as an abrupt collapse.  This evidence discloses that part of the breezeway, which is part of a building, fell down abruptly.

Philadelphia contends that the January 14 event was not an abrupt collapse because the "loss" itself was the long-term deterioration of the breezeway's wooden supports. *See* Doc. 39 at 7 (referencing "the 'loss' (deterioration of the breezeway floor)"), 8 ("the 'loss' was not caused by an 'abrupt collapse'"). This framing ignores the Collapse Endorsement's focus on whether the event was a collapse.[10]

Although this particular policy language on abrupt collapse is relatively new to North Carolina courts,[11] it has been interpreted by other courts. In *Malbco Holdings, LLC v. AMCO Insurance Company*, for example, a court applying Oregon law[12] held that this provision covers an event where trusses damaged by water over time broke and portions of the building fell a few inches. 629 F. Supp. 2d 1185, 1196 (D. Or. 2009). In *Kings Ridge Community Association, Inc. v. Sagamore Insurance Company*, a court applying Florida law[13] held that this provision covers an event where the drop ceiling, trusses, and soffits of a clubhouse deflected downward, with the trusses deflecting approximately twelve inches at midspan. 98 So. 3d 74, 75, 80 (Fla. Dist. Ct. App. 2012); *accord Key Biscayne Ambassador Condo. Ass'n, Inc. v. Aspen Specialty Ins. Co.*, No. 16-CV-24564, 2018 WL 1863741, at *5–6 (S.D. Fla. Feb. 5, 2018), *report and*

---

[10] The policy addresses "abrupt collapse" and "standing" in different parts of the Collapse Endorsement, but the parties and the cases seem to treat them as part of the same issue. *See infra* at 18–20 for further discussion of the standing exclusion.

[11] *See Hunter v. State Farm Fire & Cas. Co.*, No. 5:17-CV-00224-FDW-DSC, 2019 WL 937338, at *3 (W.D.N.C. Feb. 26, 2019) (noting this specific language on abrupt collapse "is an issue of first impression for North Carolina courts").

[12] Relevant Oregon law appears to be similar in relevant part to North Carolina law.

[13] Relevant Florida law appears to be similar in relevant part to North Carolina law.

*recommendation adopted,* No. 16-24564-CIV, 2018 WL 1859341 (S.D. Fla. Feb. 23, 2018) (finding abrupt sagging or falling down of the ceilings to constitute collapse). Here, the breezeway's sudden one-foot drop and the fallen breezeway and debris are even more significant than the damage in *Malbco* and *Kings Ridge*.

Other courts have interpreted this language and found it to be ambiguous as to how far a part of a building must fall to qualify as an "abrupt collapse." *See, e.g.*, *Malbco*, 629 F. Supp. 2d at 1196; *Kings Ridge*, 98 So. 3d at 78. This lack of clarity in the policy is construed against the insurer. *Malbco*, 629 F. Supp. 2d at 1196 ("[I]t is not the trial court's responsibility to rewrite the policy to protect the insurer. If [the insurer] wanted to limit its risk to actual and complete collapse to the ground, it could easily have done so."); *Kings Ridge*, 98 So. 3d at 78 (finding the policy ambiguous since it "is not written in terms of how far a part of a building must fall down or to what degree a part of a building must cave in to constitute 'collapse'").

## C. Caused By

### 1. Building Decay.

The long-term decay in the breezeway's wooden supports appears to constitute "'[b]uilding' decay that is hidden from view" under § II(D)(2)(a). Philadelphia has not alleged to the contrary. Nor does it assert that DENC knew of the decay before January 14, 2018, and its adjuster confirmed DENC could not have known in advance.[14] And

---

[14] Because "[t]he deterioration was covered by a vinyl ceiling covering," Mr. Nunn informed Philadelphia that DENC could not have known that "an issue existed simply from a visual inspection," "nor would it have been evident without intrusive examination." Doc. 38-1.

Philadelphia does not contend that the policy's "decay or deterioration" exclusion bars coverage provided under the Collapse Endorsement—nor could it, as that exclusion conflicts with coverage under the endorsement, which prevails. *See Anderson*, 2013 WL 445998, at *5.

### 2. Defective Methods.

An abrupt collapse caused by "use of defective methods in construction" is covered, if the collapse is also caused in part by the "weight of people." Section II(D)(2)(d)(4). As previously discussed, there is evidence that the collapse was caused in part by the weight of people.

The evidence is undisputed that the design of the breezeway—inadequate supports and waterproofing, as well as problematic dryer vent design—has been part of the building for years, potentially since it was built. *See* Doc. 32-14 at 12 ("It appears that the original building contractor and/or architect of record failed to properly install and/or detail the system to prevent this issue."); Doc. 32-13 at 17–18 (damage began "[t]he day the building was put into operation, 14 years ago," due to "a lack of water management system" and other issues noted). DENC has thus met its burden to demonstrate the January 14 collapse falls within the Collapse Endorsement's terms.

### D. Exclusions

As DENC has shown coverage under the abrupt collapse provision, based both on decay and on defective construction plus the weight of people, the burden then shifts to Philadelphia to show that an exclusion bars coverage for DENC's claim. Philadelphia relies on § II(D)(3).

### 1.    In Danger Of

Coverage for a structure "that is in danger of falling down or caving in" is excluded under § II(D)(3)(a).  Here, however, the breezeway did fall down:  all of it fell down about a foot, and parts of it fell to the ground.  Philadelphia has not met its burden to demonstrate this exclusion applies.

### 2.    Buildings that are Standing.

Sections II(D)(3)(b) and (c) exclude coverage for parts of buildings that are "standing."  Here, the building itself remained standing, but the breezeway, which is part of the building, was no longer standing.  The evidence is undisputed that it had fallen approximately one foot and that part of the breezeway was on the ground below.  Thus, part of the building was not standing, and the exclusion does not apply.  *See Kings Ridge*, 98 So. 3d at 78.

Philadelphia asserts the breezeway was still "standing" afterwards.  But as noted *supra*, Philadelphia does not dispute that the breezeway suddenly fell roughly one foot and that parts of it did fall to the ground.  The case law does not support Philadelphia's position.

In *Kings Ridge*, the court interpreted similar policy language as here and held that a clubhouse whose drop ceiling, eaves, and trusses had fallen approximately a foot was not standing, and the exclusion did not bar coverage.  The court noted that while the "standing" exclusion could be understood to require that the entire building or part of the building was on the ground, that interpretation did not make sense in the context of the rest of the policy language.  Such a reading would render the policy language providing

coverage when the building could not be occupied as superfluous, since a building that has completely fallen to the ground obviously cannot be occupied. *See* 98 So. 3d at 78. The court noted that the policy was not written "in terms of how far part of a building must fall down" to constitute a collapse, *id*. at 78, and that "standing" can easily mean something less than a total falling down of an entire or part of a building. *Id*. at 77–78. *See generally Ken Johnson Props., LLC v. Harleysville Worcester Ins. Co.*, No. 12–1582 (JRT/FLN), 2013 WL 5487444, at *10–12 (D. Minn. Sept. 30, 2013) (collecting cases, finding similar language to be ambiguous, and concluding that a roof that sagged over 10 inches after a rain event was a covered event under the collapse endorsement).

Philadelphia relies on *Rector Street Food Enterprises, Ltd. v. Fire & Casualty Insurance Company of Connecticut*, 827 N.Y.S.2d 18 (N.Y. App. Div. 2006), and *Hunter*, 2019 WL 937338, to support its contention that the breezeway here has not collapsed. Both courts found "abrupt collapse" had not occurred in buildings with clear damage: in *Rector Street*, the building had "two-to-three-inch-wide cracks in its façade" and "was sinking, out of plumb, and leaning," 827 N.Y.S.2d at 19, and in *Hunter*, the living room window header sagged by one inch, and "the exterior basement door was difficult to open due to sagging above it." 2019 WL 937338 at *1. The *Rector Street* court simply stated that despite façade cracks, the building itself was "indisputably standing," 827 N.Y.S.2d at 19; here, of course, there was substantially more harm than cracks and sinking. Both courts also based their decisions on the lack of abrupt collapse: as the *Hunter* court noted, "there were no abrupt shifts to the wall's structure throughout the relevant time period," and thus no "abrupt falling down or caving in" occurred.

*Hunter*, 2019 WL 937338, at *4; *see also Rector St. Food Enters. Ltd.*, 827 N.Y.S.2d at 19 (not "loss attributable to 'abrupt' collapse"). In contrast, DENC's uncontroverted evidence indicates that on January 14, Building 2020's breezeway suddenly fell over one foot from its normal location, and soon thereafter part of the breezeway collapsed onto the floor below. *See* Doc. 34-6 at ¶ 9; Doc. 34-7 at ¶¶ 9–10. The breezeway was not structurally functional and was no longer "standing" after the January 14 party. This exclusion does not apply.

### E. Summary

During a party when many people were jumping and dancing, the second-floor breezeway of Building 2020 suddenly and abruptly collapsed, falling more than one foot in its entirety, and part of it—along with additional debris—falling to the ground. After the party, the breezeway was not standing. In addition to the weight of people, both decay and defective construction methods contributed to the collapse. Accordingly, coverage is available under the Collapse Endorsement and is not excluded.

### III. Commenced

Philadelphia's policy covers "'loss' commencing" during the relevant policy period and defines "loss" as "accidental loss or damage." Doc. 32-8 at 110, 111. The period at issue ran from November 25, 2017, to November 25, 2018. Here, the collapse occurred and the loss commenced on January 14, 2018, when the breezeway fell down.

Philadelphia maintains that since the breezeway damage likely began when the building was constructed in 2004, the "loss" did not "commence" during this policy period and is not covered. Doc. 32 at 24–25; Doc. 39 at 6, 11–14; Doc. 42 at 7. This

20

interpretation is not reasonable.  The loss here is the collapse of the breezeway, not the water damage; the collapse occurred on a date certain within the policy period.

## IV.    Breach of Contract Claim

In addition to the declaratory judgment claim, DENC has a breach of contract claim.  It is undisputed that Philadelphia has not complied with its obligation under the insurance policy to pay for DENC's loss.  Beyond its policy interpretation arguments that have been rejected by the Court, Philadelphia has produced no reason that excuses its non-performance.  Accordingly, Philadelphia breached its contract with DENC.

## V.    Conclusion

The collapse of Building 2020's second-floor breezeway on January 14, 2018, is covered under Philadelphia's insurance policy, and Philadelphia owes DENC for this loss.  Because Philadelphia incorrectly denied coverage for this loss, Philadelphia is also liable to DENC for breaching its insurance contract.

The motions for summary judgment remain under advisement as to the plaintiff's other claims (bad faith, Chapter 75, and breach of the covenant of good faith and fair dealing); the plaintiff's request for attorney's fees, Doc. 34 at 26–27; and Philadelphia's argument on the scope of reimbursement to which DENC is entitled.  Doc. 36 at 26–28.

It is **ORDERED** that:

1.  The plaintiff's motion for partial summary judgment, Doc. 33, is **GRANTED** as to its claims for Declaratory Judgment, as stated herein, and breach of contract.  The policy provides coverage for DENC's losses, and Philadelphia breached the contract by not paying.

2. As to the declaratory judgment and breach of contract claims, the defendant's motion for summary judgment, Doc. 31, is **DENIED**.

3. The remaining aspects of the pending motions, Docs. 31 and 33, remain under advisement.

This the 15th day of October, 2019.

_____
UNITED STATES DISTRICT JUDGE