IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| DENC, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:18-CV-754 |
| | ) | |
| PHILADELPHIA INDEMNITY | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

Philadelphia Indemnity Insurance Company denied the claim of its insured,

DENC, after the breezeway collapsed on a building owned by DENC. The Court granted

summary judgment for DENC on its declaratory judgment and breach of contract claims

as to coverage and on one of DENC's Chapter 75 Unfair and Deceptive Trade Practices

Act claims based on a deceptive letter from Philadelphia denying coverage. Summary

judgment was entered for Philadelphia on DENC's other extra-contractual claims.

DENC now moves for attorneys' fees and costs under N.C. Gen. Stat. § 75-16.1.

Because Philadelphia acted willfully and refused to resolve the matter fully for many

months, DENC's motion is granted. The Court will reduce the amount of the fee after

factoring in appropriate considerations.

### Findings of Fact

Philadelphia issued a commercial lines insurance policy to DENC covering "direct

physical loss" to an apartment building DENC owned in Alamance County. *See DENC,*

*LLC v. Philadelphia Indemnity Ins. Co.*, 421 F. Supp. 3d 224, 226 (M.D.N.C. 2019); Doc. 2 at ¶ 13. On January 14, 2018, the breezeway of the building collapsed during a college party. *DENC, LLC*, 421 F. Supp. 3d at 227.

After DENC notified Philadelphia of the damage to the building, Doc. 2 at ¶ 32; Doc. 14 at ¶ 32; Doc. 34-14 at 1, Philadelphia retained an adjuster, William Nunn. Doc. 32-6. Mr. Nunn inspected the breezeway on January 16, *see* Doc. 32-11, and then hired a structural engineer to assess the breezeway. Doc. 32-12 at 1.

On January 23, Philadelphia advised DENC it was conducting the investigation under a reservation of rights. Doc. 32-12. Two days later, it sent DENC a letter stating that "[w]e have issued, or will be issuing payment to you, or on your behalf, for damages or injuries sustained" for the claim and that Philadelphia will "be looking to those parties responsible for the damages sustained and we will be seeking reimbursement of all monies paid under the policy." Doc. 34-12.

The structural engineer visited the building on January 31 and issued his report on February 8. Doc. 32-14 at 2, 4. He catalogued multiple ways in which water had seeped into the breezeway's wood framing, photographed the resulting biological growth and wood decay, *id.* at 4–12, and opined that "[t]he damage is not the result of a sudden, short-term event." *Id.* at 12.

Around this time, and despite the January 25 letter saying it would provide coverage, a property claims specialist at Philadelphia drafted a letter denying coverage for DENC's loss. Doc. 34-1 at 6–7. The letter was revised and approved by a Philadelphia vice president. *Id.* at 9; Doc. 16-1. The vice president had the engineer's

report when he approved the letter. Doc. 34-1 at 10. On February 19, Philadelphia sent DENC an eight-page, single-spaced denial letter. Doc. 34-14.

The denial letter was confusing in many ways. It did not mention, much less rescind or explain, its earlier letter saying it would provide coverage. *Id.* The letter repeated verbatim several pages of what purported to be policy excerpts, then—without explaining how these policy excerpts apply individually or in combination—noted Philadelphia would deny coverage for a reason not mentioned by those cited policy excerpts. *See DENC, LLC v. Philadelphia Indemnity Ins. Co.*, — F. Supp. 3d —, 2019 WL 6615330, at *2–3 (M.D.N.C. Dec. 5, 2019). The letter included provisions that were not even part of the policy—several had been deleted and superseded by policy amendments or endorsements—and it also quoted other provisions that patently did not apply to the breezeway collapse at issue. *Id.*[1] The letter quoted a collapse provision that had been replaced in its entirety by an endorsement, *see* Doc. 34-15 at 7–8, and it failed to address or discuss at all the collapse provision in the endorsement or the particular provision that the Court later found did, in fact, cover DENC's loss. *DENC, LLC*, 421 F. Supp. 3d at 231–33. At their depositions, neither the author of the letter nor the vice president who reviewed and approved the letter were able to offer any coherent explanation for the confusing and irrelevant information in it. *See generally* Docs. 34-1, 34-15. Philadelphia's denial letter invited DENC to respond if it disagreed with Philadelphia's decision.

---

[1] The Court will not repeat all the ways in which this letter tended to deceive, which the Court summarized in a previous summary judgment order. *See DENC, LLC*, 2019 WL 6615330.

DENC hired counsel, who wrote to Philadelphia on July 13, 2018, and outlined the reasons DENC believed the Philadelphia policy provided coverage. Doc. 34-18. DENC specifically identified the parts of the policy that the Court ultimately found provided coverage. *Id.* at 2–4. It also pointed out the many quotations of inapplicable language and corrected various mistakes and oversights in the February 19 denial letter. DENC advised Philadelphia that the letter could give rise to an unfair and deceptive trade practices claim under N.C. Gen. Stat. § 75-1.1, which would trigger treble damages and attorneys' fees. *Id.* at 6–8. DENC demanded that Philadelphia accept coverage for the collapse, stating that "[u]pon assumption of liability by Philadelphia, DENC will submit its damages for processing and reimbursement." *Id.* at 9. DENC asked Philadelphia to respond and stated that if it did not hear from Philadelphia within two weeks, it would "institute litigation." *Id.*

After Philadelphia received the letter, it did not have any internal meetings to discuss the letter, and the vice president did not provide a copy of the letter to his supervisor. Doc. 34-1 at 32–33. Indeed, there is no evidence that Philadelphia gave DENC's letter any attention, much less that it re-evaluated its coverage decision, looked at the applicable language it had not mentioned in the denial letter, or considered the possibility of a Chapter 75 violation. Even though Philadelphia's own policies require it to respond to such letters, *id.* at 33–34, Philadelphia did not respond within the requested time frame. *Id.* at 34–35.

DENC filed suit in state court on July 30, 2018. In the complaint, DENC sought a declaratory judgment and damages for breach of contract and violations of the North

4

Carolina Unfair and Deceptive Trade Practices Act. Doc. 1-1. Consistent with North Carolina practice, the complaint did not state a specific dollar amount of damages.

In contrast to Philadelphia's denial letter—which cited superseded policy provisions on collapse and omitted the applicable provision covering a collapse caused by the "[w]eight of people," Doc. 32-8 at 181—Philadelphia's answer "specifically denied that the Breezeway collapsed suddenly when a large number of students were congregated on the Breezeway." Doc. 14 at ¶ 32; *id.* at 17–20 (fourth, eighth, and ninth affirmative defenses addressing collapse provision). The answer did not include affirmative defenses based on the inapplicable provisions cited in the denial letter, such as steam boilers and flood. *Compare* Doc. 14 at 16–20 *with* Doc. 34-14 at 3.

During the next several months, various things happened in the litigation, including service on Philadelphia, removal to this court from state court, and the filing of an answer. At no point during these early proceedings did the plaintiff demand, nor did the defendant offer, a specific amount to settle the case.[2]

As far as the record shows, the first time DENC told Philadelphia the amount it contended Philadelphia owed on the insurance contract was on December 19, 2018, when DENC served its initial pretrial disclosures under Fed. R. Civ. P. 26(a)(1)(A). DENC informed Philadelphia that it "has initially calculated damages of $424,862.89," plus treble damages, interest, attorneys' fees, expenses and costs. Doc. 59-1 at 5.

---

[2] There is no direct evidence of this, but as the parties have otherwise submitted declarations outlining the course of settlement negotiations, *see* Docs. 76-1, 77-1, 78-1, the Court infers that no other offers or demands were made or extended.

Philadelphia did not make any offer to settle the case in response to this disclosure. Philadelphia thereafter had full access to the discovery tools it needed to obtain information from DENC about DENC's damages. *See, e.g.*, Fed. R. Civ. P. 26(b).

Around the time mediation was scheduled to take place, DENC disclosed an expert witness who would testify on damages and provided a summary of his opinions. Doc. 32-4. The witness, a CPA, opined that DENC incurred several expenses that would not have been necessary absent the building collapse, *id.* at 11–14, and that those expenses totaled approximately $424,765.58 plus undetermined attorneys' fees.[3]

Two months after an unsuccessful mediation, Doc. 24,[4] Philadelphia made a Rule 68 offer of judgment for $212,500 on May 9, 2019. In that offer of judgment, Philadelphia offered "to allow judgment to be taken . . . for the total sum of [$212,500.00], with costs accrued at the time of this Offer as well as attorneys' fees now accrued to the extent that attorneys' fees are recoverable" by DENC. Doc. 76-5 at 3.

One week later, DENC asked Philadelphia to clarify the offer of judgment, noting that it was ambiguous as to whether $212,500 included any attorneys' fees and costs, and if it did not, whether Philadelphia was offering to pay such fees and if so, under what

---

[3] The witness did not provide a total figure, but broke damages into categories: $62,524.83 for demolition and construction costs; $4,691 for engineering and inspection services; $35,491.92 for lost business income; $326.34 for meal reimbursements; $639.72 for mileage; $324.96 for moving supplies; $11,111.43 for payroll; $639.77 for postage; $5,256.43 for cable, $4,492.27 for internet, and $249,661.33 for temporary housing for the relocated tenants; $34,515.58 for tenant subsidies; $15,000 for DENC's accounting fees; and $90 for bank fees. Doc. 32-4 at 11–14.

[4] The Court will not consider offers or demands reportedly made at mediation. *See* LR 83.9e(i). If they were considered, the result would not change.

terms and conditions. Doc. 76-6. Even though DENC's questions were reasonable, Philadelphia did not respond with a new offer of judgment or any explanation of the ambiguities. DENC did nothing to accept the offer of judgment, which soon expired under the terms of Rule 68.

Over the summer and early fall, the parties filed and briefed cross-motions for summary judgment. On October 15, 2019, the Court granted DENC's motion for partial summary judgment as to the declaratory judgment and breach of contract. *DENC, LLC*, 421 F. Supp. 3d at 236. The Court interpreted the policy to provide coverage for DENC's loss under the "confusing morass of definitions, exclusions, and exceptions" in the collapse provision. *Id.* at 229. The Court made no decision on the amount of damages, and it kept under advisement DENC's extracontractual claims. *Id.* at 236. The Court informally suggested the parties might want to discuss settlement. *See* Doc. 76-7.

Nothing happened related to settlement for over two weeks, when Philadelphia finally made a second offer of judgment on November 4. Doc. 76-10 at 4. In the offer of judgment, Philadelphia offered "to allow judgment to be taken against it" for "the total sum" of $424,765.58, plus costs and statutory interest. *Id.* The offer of judgment stated that it "applies to each and every claim for relief and every type of relief," explicitly included "any and all attorneys' fees that Plaintiff may be due in this matter," and specifically stated that "Plaintiff will not move or be entitled to any attorneys' fees if this Offer is accepted." *Id.* DENC countered the next day with a demand for "a total payment" of $1,500,000 and reminded Philadelphia of its Chapter 75 claims for treble damages and attorneys' fees. Doc. 76-11. Philadelphia did not respond to the demand,

7

eventually advising the Court that the parties had reached an impasse in settlement negotiations.  Doc. 76 at 12; Doc. 76-13.

On December 5, 2019, the Court addressed DENC's extracontractual claims in a second summary judgment order.  *See DENC, LLC*, 2019 WL 6615330.  The Court concluded that "[b]y first agreeing to provide coverage and then issuing a contrary denial letter that includes irrelevant and non-existent policy terms and otherwise does not provide 'a reasonable explanation of the basis in the insurance policy in relation to the facts' for its denial of DENC's claim, Philadelphia's conduct had the capacity to deceive DENC and violated N.C. Gen. Stat. § 58-63-15(11)(n)."  *Id.* at *3.  The Court granted DENC's motion for partial summary judgment as to its Chapter 75 claim based on subsection (n).

The Court granted summary judgment in favor of Philadelphia on DENC's common-law claim for bad faith refusal to settle.  *Id*. at *1.  The Court held that Philadelphia's evidence showed an honest disagreement about the scope of the collapse provision in the policy and that DENC did not provide evidence that Philadelphia engaged in "fraud, malice, gross negligence, insult, rudeness, oppression, or wanton and reckless disregard of plaintiff's rights, which is a necessary part of this claim."[5]  *Id.* (quoting *Lovell v. Nationwide Mut. Ins. Co.*, 108 N.C. App. 416, 422, 424 S.E.2d 181, 185, *aff'd per curiam*, 334 N.C. 682, 435 S.E.2d 71 (1993)).

---

[5] The Court omits internal citations, alterations, and quotation marks throughout this opinion, unless otherwise noted.  *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

The Court also granted summary judgment for Philadelphia as to DENC's remaining Chapter 75 claims based on other subsections of § 58-63-15(11). *DENC, LLC*, 2019 WL 6615330, at *4–5. In doing so, the Court noted "[i]t can hardly be doubted that [the denial] letter contains misrepresentations that certain provisions bar coverage," but found DENC had not shown the evidence of reliance that was necessary to succeed on a misrepresentation claim based on § 58-63-15(11)(a). The Court also ruled for Philadelphia on DENC's claim based on § 58-63-15(11)(d), as DENC had not identified evidence that Philadelphia failed to conduct a reasonable investigation of DENC's claim. Finally, the Court granted summary judgment to Philadelphia on DENC's claim under § 58-63-15(11)(g): as liability had only recently been determined, and there was no determination of how much DENC would ultimately recover, DENC's claim that Philadelphia compelled it to institute litigation to recover what was due under its insurance policy had not yet accrued. *DENC, LLC*, 2019 WL 6615330, at *4–5.

In advance of an upcoming trial date, the Court held a settlement and pretrial conference with counsel and the parties on December 18, 2019. During the settlement part of the conference, Philadelphia offered $525,000, and DENC demanded $1,500,000. Doc. 77-1 at ¶¶ 12–13; Doc. 78-2 at ¶ 8. The parties did not agree as to whether DENC's damages for breach of contract could be trebled under Chapter 75. Accordingly, the Court ordered supplemental briefing on this legal issue. The Court also specified deadlines for proposed jury instructions and time frames for offers and responses to facilitate continued negotiations. *See* Minute Entry 12/18/2019.

The next day, DENC sent Philadelphia a demand letter for $1,400,000, Doc. 76-14, and Philadelphia then increased its offer to $550,000. Doc. 76-15. On December 27, DENC sent a demand for $1,375,000, Doc. 76-16, and then—with no response from Philadelphia—a demand for $1,100,000 on January 8, 2020. Doc. 76-17. Two days later, Philadelphia responded to DENC that it would not increase its offer given the parties' disagreement about whether DENC's damages could be trebled under Chapter 75. *See* Doc. 77-3.

In its trial brief filed on December 23, Philadelphia asserted that several categories of DENC's claimed damages for breach of contract should be excluded because they were not attributable to the breezeway's collapse, but rather to long-term decay in the breezeway's supports, or because they would not otherwise "qualify" under the policy terms. Doc. 56 at 10–13. At the final pretrial conference on January 14, 2020, the Court declined to revisit the different causes of DENC's loss and held that any breezeway-related expenses could be included in damages. Doc. 73. The Court also determined that DENC was not entitled to treble its breach of contract damages on its Chapter 75 claim. *Id.* (noting only nominal damages for that claim). The parties then reached a stipulation on the amount of breach of contract damages, which was the only issue for trial. Minute Entry 01/14/20; *see* Doc. 73 (noting stipulated damages for breach of contract of $400,007.79, excluding interest and costs). The Court set a schedule to brief the issue of Chapter 75 attorneys' fees. Minute Entry 01/14/20.

On January 20, Philadelphia offered $600,000 to settle the case. Doc. 77-4. About a week later, DENC responded with a demand of $1,050,000. Doc. 78-1.

On January 31, 2020, DENC moved for attorneys' fees under Chapter 75. Doc. 75. Philadelphia responded, contesting both that DENC was entitled to fees and, if it was, the requested amount of fees. Doc. 77. DENC filed a reply brief with additional evidence. Doc. 78.

## Attorneys' Fees under Chapter 75

Under N.C. Gen. Stat. § 75-16.1, the presiding judge has discretion to "allow a reasonable attorney fee" to the attorney "representing the prevailing party," if "[t]he party charged with the violation has willfully engaged in the act or practice, and there was an unwarranted refusal by such party to fully resolve the matter which constitutes the basis of such suit." *Id*. The attorney fee is "to be taxed as a part of the court costs and payable by the losing party." *Id.* A Chapter 75 attorneys' fee award must be supported by findings of fact, both as to entitlement to the fee and the awarded amount. *See McKinnon v. CV Indus., Inc.*, 228 N.C. App. 190, 199, 745 S.E.2d 343, 350 (2013).

In the Chapter 75 context, "[a]n act or a failure to act is 'willfully' done if done voluntarily and intentionally with the view to doing injury to another." *Standing v. Midgett*, 850 F. Supp. 396, 404 (E.D.N.C. 1993); *accord Faucette v. 6303 Carmel Rd., LLC*, 242 N.C. App. 267, 279, 775 S.E.2d 316, 326 (2015). If there was no accident or mistake and the defendant's act was intentional, a court is justified in finding those actions to be willful. *Printing Servs. of Greensboro, Inc. v. Am. Capital Grp., Inc*., 180 N.C. App. 70, 81, 637 S.E.2d 230, 236 (2006), *aff'd*, 361 N.C. 347, 643 S.E.2d 586 (2007); *Bridgetree, Inc. v. Red F Mktg. LLC*, No. 3:10-cv-00228-FDW-DSC, 2013 WL 443698, at *19 (W.D.N.C. Feb. 5, 2013) (noting in the context of motions for attorneys'

fees under Chapter 75 and the North Carolina Trade Secret Protection Act, that"[w]illful means intentionally. Willful is used in contradistinction to accidental or unavoidably," and collecting cases).

Courts have found willfulness in a variety of circumstances, such as where:

- A defendant had a policy of encouraging its employees to engage in conduct found to be an unfair and deceptive trade practice, such as by defending them in resulting litigation about breach of non-compete covenants, even where the defendant did not believe the covenants were enforceable. *United Labs., Inc. v. Kuykendall*, 102 N.C. App. 484, 494–95, 403 S.E.2d 104, 111 (1991).

- A defendant intentionally converted money belonging to the plaintiff. *Faucette*, 242 N.C. App. at 279, 775 S.E.2d at 326.

- A defendant charged above contract price and made misrepresentations to hide the excess charges and persuade the plaintiff to maintain a business relationship. *Cargill, Inc. v. WDS, Inc.*, No. 3:16-cv-00848-FDW-DSC, 2018 WL 1525352, at *1, *17–18 (W.D.N.C. Mar. 28, 2018).

- A defendant took a signed loan agreement and money from the plaintiff and kept it for six months without itself signing the loan agreement. *Printing Servs. of Greensboro, Inc.*, 180 N.C. App. at 81, 637 S.E.2d at 236.

*See also Irwin Indus. Tool Co. v. Worthington Cylinders Wisconsin, LLC*, 747 F. Supp. 2d 568, 590 (W.D.N.C. 2010) (finding a Chapter 75 violation was willful for attorneys' fees purposes based on jury determination that defendant acted willfully in infringing plaintiff's trade dress and engaging in false advertising).

In evaluating whether there was an "unwarranted refusal to fully resolve the matter which constitutes the basis" of the suit, courts can take the entirety of the circumstances into account. For example, courts may look to a defendant's efforts to settle a matter before trial and the reasonableness of those efforts, including whether any settlement offers made were reasonable relative to what was ultimately awarded to the prevailing party. *See Kuykendall*, 102 N.C. App. at 486–88, 403 S.E.2d at 106–107 (finding an unwarranted refusal where the first trial's jury returned a judgment of $38,738.89, which was trebled; defendant offered $20,000 before second trial; plaintiff demanded consent decree plus $225,000, which defendant rejected; and second trial resulted in $115,000 judgment against defendant); *Lapierre v. Samco Dev. Corp.*, 103 N.C. App. 551, 561, 406 S.E.2d 646, 651 (1991) (finding unwarranted refusal where defendant did not accept plaintiff's reasonable offer or "offer some reasonable amount in an attempt to settle the matter"). A defendant's general intractability in resolving the disputed matter may constitute an unwarranted refusal to resolve. *See Barbee v. Atl. Marine Sales & Serv., Inc.*, 115 N.C. App. 641, 649, 446 S.E.2d 117, 122 (1994).

The plaintiff's conduct during settlement negotiations is also relevant. For example, in *Llera v. Security Credit Systems, Inc.*, the court noted the plaintiff's failure to respond to the defendant's settlement offers as a factor against awarding an attorney fee. 93 F. Supp. 2d 674, 679–81 (W.D.N.C. 2000). In addition, the court took into account whether and when the plaintiff quantified the amount of damages claimed. *Id.*

Finally, "[j]ust because Plaintiff and Defendant valued the case differently does not mean Defendant unreasonably refused to settle." *Russell v. Absolute Collection*

*Servs. Inc.*, No. 1:09CV515, 2012 WL 12867829, at *7 (M.D.N.C. Sept. 28, 2012), *aff'd*, 763 F.3d 385 (4th Cir. 2014). If there are "unique questions of law, especially as applied to the facts of record," that gave the defendant "valid reasons to refuse to settle this matter and to litigate it to conclusion," courts may factor this in as well. *Media Network, Inc. v. Long Haymes Carr, Inc*., 197 N.C. App. 433, 460–61, 678 S.E.2d 671, 688–89 (2009); *Food Lion Inc. v. Capital Cities/ABC, Inc.*, No. 6:92CV00592, 1997 WL 715017, at *1 (M.D.N.C. Aug. 29, 1997). But if the defendant's litigation conduct indicates it considered the underlying conduct that violated Chapter 75 to be a permissible business practice, that can be a reason to find an unwarranted refusal to settle. *See Pinehurst, Inc. v. O'Leary Bros. Realty, Inc.*, 79 N.C. App. 51, 64, 338 S.E.2d 918, 926 (1986) (affirming finding of unwarranted refusal to settle where defendants contended their deceptive letter "was an acceptable business practice").

The Court may only award "reasonable" attorneys' fees. N.C. Gen. Stat. § 75-16.1. Federal courts routinely apply the considerations set forth in *Hensley v. Eckerhart,* 461 U.S. 424 (1983), and its progeny to attorneys' fees requests, *see, e.g.*, *Grissom v. The Mills Corp*., 549 F.3d 313, 321 (4th Cir. 2008), and North Carolina courts have cited and applied *Hensley* in a number of cases involving state statutes with fee-shifting provisions. *See, e.g., Morris v. Scenera Research, LLC,* 229 N.C. App. 31, 57, 747 S.E.2d 362, 378 (2013), *aff'd in part, rev'd in part, on other grounds*, 368 N.C. 857, 788 S.E.2d 154 (2016); *Okwara v. Dillard Dept. Stores*, 136 N.C. App. 587, 594–95, 525 S.E.2d 481, 486–87 (2000); *Hamilton v. Memorex Telex Corp.*, 118 N.C. App. 1, 16–17,

14

454 S.E.2d 278, 286 (1995); *Davis v. Taylor*, 81 N.C. App. 42, 54, 344 S.E.2d 19, 26 (1986).

To determine an appropriate fee, the court first determines the "lodestar amount (reasonable hourly rate multiplied by hours reasonably expended)." *Grissom*, 549 F.3d at 320.[6] The court should then reduce the lodestar so as not to compensate the prevailing party for time "spent on unsuccessful claims unrelated to successful ones." *Johnson v. City of Aiken,* 278 F.3d 333, 337 (4th Cir. 2002).

To determine whether claims are related, the Court considers whether and to what degree there was a common nucleus of operative fact with other claims that do not have a fee-shifting provision. *See, e.g.*, *Irwin Indus. Tool Co.*, 747 F. Supp. 2d at 591 (awarding requested fees under Chapter 75 where discovery on Chapter 75 claim and Lanham Act claim overlapped significantly); *Whiteside Estates, Inc. v. Highlands Cove, L.L.C.*, 146 N.C. App. 449, 467, 553 S.E.2d 431, 443 (2001) (affirming award of fees where all claims arose from same nucleus of operative facts and claim with statutory attorneys' fee provision was "inextricably interwoven" with common law claims without such fee shifting). In accounting for unsuccessful, unrelated claims, the court has the discretion to

---

[6] The Fourth Circuit has outlined factors to determine what is reasonable in cases arising under federal law. *See, e.g.*, *Grissom*, 549 F.3d at 321; *Spell v. McDaniel,* 824 F.2d 1380, 1402 n.18 (4th Cir. 1987). North Carolina courts apply similar factors, differing only in semantics: "the time and labor expended, the skill required, the customary fee for like work, . . . the experience or ability of the attorney, . . . the novelty and difficulty of the questions of law, the adequacy of the representation, the difficulty of the problems faced by the attorney, and especially any unusual difficulties, and the kind of case for which the fees are sought and the result obtained." *Fed. Point Yacht Club Ass'n Inc. v. Moore*, 244 N.C. App. 543, 781 S.E.2d 351 (Table), at *10 (2015) (quoting *United Labs., Inc. v. Kuykendall*, 335 N.C. 183, 195, 437 S.E.2d 374, 381–82 (1993)).

either "attempt to identify specific hours that should be eliminated," or to "simply reduce the award," *Hensley*, 461 U.S. at 436–37, such as by a percentage. *See, e.g.*, *Mercer v. Duke Univ.*, 401 F.3d 199, 209 (4th Cir. 2005) (reducing award by percentage to reflect plaintiff's limited success).[7]

### Analysis and Additional Findings of Fact

North Carolina requires insurance companies to "promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim." N.C. Gen. Stat. § 58-63-15(11)(n). As the Court previously held, by first saying it would provide coverage and then issuing a contrary denial letter that included irrelevant and non-existent policy terms and otherwise did not provide a reasonable explanation of the basis in the insurance policy in relation to the facts for its denial of DENC's claim, Philadelphia's conduct had the capacity to deceive DENC and violated N.C. Gen. Stat. § 58-63-15(11)(n). *DENC, LLC*, 2019 WL 6615330, at *2–4. Under N.C. Gen. Stat. § 75-16.1, DENC is entitled to recover a reasonable attorneys' fee if Philadelphia's violation was willful and if there was an unwarranted refusal to settle.

### 1. Was Philadelphia's violation willful?

When Philadelphia sent the denial letter to DENC in January 2018, it acted willfully. The letter was sent intentionally and not accidentally or by mistake. It was written by a property claim specialist for Philadelphia, and it was approved by a vice

---

[7] "There is no guiding North Carolina case law that has established a method to determine the reasonable relationship between success and the amount of fees requested." *Out of the Box Developers, LLC v. Doan Law, LLP*, No. 10 CVS 8327, 2014 WL 4298329, at *10 (N.C. Super. Aug. 29, 2014).

president before it was sent.  Philadelphia did not take reasonable care in writing the letter, which as crafted would be largely incomprehensible to an insured.  During depositions, the explanations by the writer of the letter as to why it included a multitude of irrelevant or superseded provisions were neither clear nor credible, and the vice president who reviewed it appeared flummoxed by the letter, in hindsight.  While the letter reviewed some facts, it made no real effort to relate any particular policy provision to those facts and it did not mention the applicable collapse endorsement.

Philadelphia contends that its violation of N.C. Gen. Stat. § 58-63-15(11)(n) was not willful, pointing to the Court's holding at summary judgment that DENC had offered no evidence to rebut Philadelphia's evidence of an "honest disagreement" over coverage and no evidence that "fraud, malice, gross negligence," or other similar conduct.  *See DENC, LLC*, 2019 WL 6615330, at *1.  But that "honest disagreement" over coverage has little to do with the deceptive conduct and misrepresentations in Philadelphia's denial letter, which is the conduct giving rise to the Chapter 75 claim.  Conduct does not have to be fraudulent, malicious, or grossly negligent to be willful, and DENC has easily met its burden to show that Philadelphia acted deliberately and intentionally when it initially sent a letter saying it would provide coverage and then wrote and sent the confusing and deceptive denial letter to DENC.

## 2.  Was Philadelphia's refusal to fully resolve the claim unwarranted?

After Philadelphia received DENC's response to the deceptive denial letter, it took no steps to give DENC's arguments serious attention.  Philadelphia did not give new consideration to the collapse endorsement that was actually in the policy, even though

DENC pointed out its applicability. In violation of its own policy, it did not respond to DENC's letter. Neither at the time of denial nor after receiving DENC's letter in response did Philadelphia perform the analysis of its own policy of the kind it undertook in its summary judgment briefing.

Philadelphia did not pursue the obviously irrelevant policy provisions it mentioned in the denial letter in its answer as a basis for no coverage, but it did continue to defend the denial letter. *See, e.g.*, Doc. 36 at 22–23. And to this day, Philadelphia appears to believe its first letter granting coverage and second letter denying it were permissible business practices. *See* Doc. 77 at 4, 12 (referring to letter "advising of potential subrogation efforts" that "inadvertently stated" that Philadelphia would be issuing payment for the loss and mentioning only a few policy provisions invoked by denial letter). *See Pinehurst, Inc.*, 79 N.C. App. at 64, 338 S.E.2d at 926 (finding unwarranted refusal in part because defendants considered their Chapter 75 violation to be a permissible business practice).

Philadelphia made no offer to resolve the claim at any time until the mediation. The first admissible offer was an offer of judgment made soon thereafter, for only half the contract damages sought by DENC and for barely more than half of the contract damages DENC ultimately recovered. Even after the Court entered summary judgment on the coverage issue, Philadelphia's second offer of judgment only covered DENC's contract damages and did not include any amount to account for the unfair and deceptive acts in the denial letter. Only after the Court ruled in DENC's favor on the Chapter 75 claim did Philadelphia make an offer that incorporated that claim's settlement value.

Based on all of these findings, the Court finds and concludes that up to the time of its settlement offer on December 18, 2019, for $525,000, Philadelphia engaged in an unwarranted refusal to settle.[8]  Philadelphia wrote the confusing insurance policy and the confusing denial letter, and DENC should not bear the burden of attorneys' fees incurred in responding to inconsistent coverage letters or in correcting Philadelphia's deceptive description and application of that policy in the denial letter.  Philadelphia failed to consider DENC's explanation of coverage and failed to respond to DENC in a timely fashion, requiring this lawsuit.  While it ultimately did have a legitimate argument that there was no coverage, the evidence indicates and the Court finds that those arguments were not carefully developed until after the lawsuit was filed.  Even after those arguments were developed, none of its settlement offers before December 18, 2019, took into account the strength of DENC's argument on its successful Chapter 75 claim, on which DENC almost certainly would have prevailed even if it lost on the coverage issue.

That said, the Court will not award DENC any attorneys' fees incurred after the December 18 offer.  That offer, for $525,000, was finally reasonable, as it was for an amount roughly 25% over DENC's full contract damages and factored in both the value of the Chapter 75 claim and the strength of Philadelphia's argument—on which it would ultimately be successful—that the contract damages should not be trebled.[9]

---

[8] Philadelphia does not contend that the provisions of Rule 68(d) come into play, and the Court agrees they do not.

[9] While the Court is confident of its ruling on coverage, there was an honest disagreement about the meaning and application of the collapse endorsement. Thus, there is at least a

Philadelphia contends there was no unwarranted refusal to settle because DENC did not provide any estimate of its damages for months after sending its demand letter, and DENC's demands consistently relied on its assumption of treble damages, on which it was ultimately unsuccessful. Doc. 77 at 5–9, 13–16. Given that the collapse resulted in a need for repairs, DENC cannot be faulted for waiting to submit its full actual damages rather than speculative damages. Certainly, this disagreement as to whether DENC could treble its damages contributed substantially to the distance between their settlement offers. But it took ten months after DENC first estimated its damages, *see* Doc. 59-1 at 5, for Philadelphia's settlement offers to even meet the estimated damages amount, and another two months to increase somewhat to account for the disagreement about trebling damages or for attorneys' fees. *See Kuykendall*, 102 N.C. App. at 486–87, 403 S.E.2d at 106–107 (evaluating whether settlement offers were reasonable relative to what prevailing party ultimately received).

While the Court agrees that DENC was just as guilty of posturing during the settlement process as Philadelphia was,[10] Philadelphia, not DENC, is the wrongdoer here:

---

possibility the coverage decision could be changed on appeal. That should also factor into settlement value.

[10] Indeed, this is a case study for how unreasonable behavior during settlement negotiations can unnecessarily increase everyone's litigation costs. There may be reasons why litigants begin negotiations with low-ball offers and high-ball demands, but here both parties failed and refused to participate in the usual give-and-take of settlement discussion that typically follows opening numbers. Possibly they believed their own hype, or they were overly focused on not appearing "weak," or they took the other side's blustering too seriously. Whatever the reasons, neither party moved off unrealistic numbers in a timely fashion, each failed to respond reasonably or quickly when the other side finally did make some movement, and everyone gave up too easily on continued negotiations.

Philadelphia sent conflicting coverage letters and wrote a deceptive denial letter. Its failure to make a reasonable settlement offer that gave any weight at all to Philadelphia's deceptive conduct in sending the denial letter means that for nearly two years, Philadelphia engaged in an unwarranted refusal to settle. *See Lexington Ins. Co. v. Scott Homes Multifamily Inc.*, No. CV-12-02119-PHX-JAT, 2016 WL 5118316, at *11 (D. Ariz. Sept. 21, 2016) (while both parties postured during settlement negotiations, attorneys' fees were appropriate where one party did not make a reasonable counter-offer). While the Court will take DENC's settlement conduct into account, *see* discussion *infra* at 21-22, Philadelphia does not get off the hook for all of the attorneys' fees incurred by DENC to pursue the Chapter 75 claim merely because DENC might have done a better job negotiating or because Philadelphia made a last-minute offer that was finally reasonable.

DENC contends it is entitled to its fees through the briefing on the attorneys' fees motion. Doc. 78 at 12–13. The court concludes that given the reasonable settlement offer Philadelphia made on December 18 for $525,000, fees after that date would be inappropriate. *See Sheppard v. Riverview Nursing Ctr., Inc.*, 88 F.3d 1332, 1337 (4th Cir. 1996) (court evaluating attorneys' fee request has discretion to consider whether to end fees after plaintiff refused a reasonable settlement offer, since such refusal "promotes few public interests"). DENC was ultimately unsuccessful on its claim that its contract damages should be trebled under Chapter 75, and Philadelphia should not have to pay DENC's attorneys' fees for that unsuccessful argument. As noted, DENC shared in responsibility for the failed settlement negotiations by its refusal to come off its high-ball

settlement offer until very late in the game.  And had DENC accepted that reasonable

offer in mid-December, the litigation over the fee amount would have been unnecessary.

### 3. Reasonable amount of fees

DENC seeks fees of $689,100.69 plus $5,243.69 for research service costs.  Doc.

78 at 12–13; Doc. 78-3 at ¶ 8 (noting Westlaw, PACER, and Delaware Secretary of State

research costs).  Philadelphia has not challenged the hourly rates charged by DENC's

attorneys,[11] and those rates are reasonable for the complicated legal work required in this

case.  Nor does Philadelphia challenge their experience and qualifications to undertake

the work, and the Court finds they were qualified.

The Court concludes that Philadelphia should pay all of DENC's attorneys' fees

and research costs incurred after Philadelphia sent the deceptive denial letter through and

until Philadelphia removed the case to federal court on September 4, 2018.  Doc. 1.  To

evaluate its response to Philadelphia's deceptive denial letter and then to draft an

appropriate complaint, DENC's attorneys had to fully investigate the facts and the law.

During this initial time frame, the work related to the successful Chapter 75 claim

overlapped almost completely with the other claims, successful and unsuccessful, and the

time spent solely on the unrelated claims would have been minimal.  Particularly at the

beginning of a case, "[m]uch of counsel's time will be devoted generally to the litigation

---

[11] DENC seeks payment for senior partner Gregg McDougal ($550/hr), partners John Branch ($375–$390/hr) and Denton Worrell ($350/hr), associates Andrew Brown ($245–$250/hr) and Lawrence Duke ($150/hr), and paralegal Christine McCaffrey ($165/hr).  Doc. 76 at 23.  The invoices indicate several other employees from both firms who worked on the case, but DENC does not seek payment for their time.  *See* Doc. 76 at 24 n.3.

as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." *Okwara*, 136 N.C. App. at 595, 525 S.E.2d at 487 (quoting *Hensley*, 461 U.S. at 435). There was no duplication of effort by attorneys during this time frame, and many tasks were appropriately assigned to an associate at a lower hourly rate.

The full lodestar amount of fees until September 4, 2018, totals $84,092, and the costs requested total $1,363.49. Given that the work during this phase had to focus on understanding and rebutting the deceptive denial letter, and that DENC was fully successful on the Chapter 75 claim arising from that letter, it is particularly appropriate that Philadelphia pay these fees and costs in their entirety, without reduction.

But in its discretion, the Court will reduce DENC's fee request for the time after removal through the time of the reasonable settlement offer, upon consideration of the relevant factors, *see supra* note 6, and to account for several things specific to the facts of this case. First, there was some unnecessary duplication of effort during deposition preparation and summary judgment briefing, with as many as four lawyers spending many hours on the same tasks. Second, DENC's attorneys spent a fair amount of time on unsuccessful and unrelated claims and issues. To give just a few examples: most of DENC's unsuccessful claims ended up having only marginally overlap with the facts raised by the successful claim based on the deceptive denial letter;[12] DENC's attorneys

---

[12] The "inadequate investigation" Chapter 75 claim based on subsection (d) focused on Philadelphia's factual investigation, unlike the denial letter claim that focused on the policy language. And DENC's Chapter 75 claim based on subsection (g)—compelling the insured to institute litigation—was unsuccessful because it had not yet accrued, *DENC, LLC*, 2019 WL 6615330, at *5, raising an independent legal issue. DENC has made no argument that its breach

spent time evaluating a motion to dismiss raised by a party it initially included as a defendant and who was ultimately dismissed, *see* Doc. 76-2 at 41, and time researching whether to seek a remand to state court, *see, e.g.*, *id.* at 33; and during the fall of 2019, DENC spent a good bit of time on its unsuccessful quest to treble the contract damages.[13] Third, there is no statutory provision for an insured to recover its attorneys' fees for successfully prosecuting a coverage case against its insurer, and the Chapter 75 violation here was narrow in time and discrete in act; as previously noted, Philadelphia largely abandoned its focus on irrelevant or non-existent policy provisions once the litigation began. While there was some overlap between the factual and legal issues raised by the successful Chapter 75 claim and the coverage and breach of contract claims, the invoices and the court filings establish that the latter two claims were the heart of the lawsuit for many months and required substantially more work than the Chapter 75 claim.

There are factors to take into account in support of a substantial fee. DENC was successful in obtaining a ruling on summary judgment that Philadelphia had committed an unfair trade practice, and, as noted, there was some factual overlap between the coverage issue and the successful Chapter 75 claim.

---

of the covenant of good faith and fair dealing or its bad faith claim are related to its Chapter 75 claim based on the letter. Doc. 78 at 5 n.2.

[13] As best the Court can tell from trying to link up the research costs to the time records, the research costs were overwhelmingly spent on these unsuccessful questions. To the extent that is not so, the Court is unable to tell what costs were incurred on successful related claims. DENC has the burden to show its fee request is reasonable; the Court will not require Philadelphia to pay for any research costs DENC incurred after the case was removed.

At least as importantly, courts also consider "the significance of the legal issue on which the plaintiff prevailed, and the public purpose served" by the litigation in gauging success. *Mercer*, 401 F.3d at 204 (quoting *Farrar v. Hobby*, 506 U.S. 103, 122 (1992) (O'Connor, J., concurring)) (collecting cases that apply these factors). Here, the Court found Philadelphia violated North Carolina's proscription on unfair and deceptive trade practices in the way that it responded to DENC's claim. While DENC recovered only nominal damages on the successful Chapter 75 claim, there is a substantial public purpose served by this kind of litigation, which can, and one hopes will, affect not only Philadelphia's conduct in the future but perhaps that of other insurance companies tempted to write incomprehensible denial letters. A significant attorneys' fee award directly serves both this public purpose and the specific statutory aims of Chapter 75. *See Marshall v. Miller*, 302 N.C. 539, 549, 276 S.E.2d 397, 403–404 (1981) (noting Chapter 75 was enacted "so that local business interests could not proceed with impunity," and the provision for attorneys' fees "encourages private enforcement in the marketplace").

Taking these things into account, and in is discretion, the Court will reduce DENC's requested fees from September 5, 2018, through December 18, 2019, by 70%, rounded for simplicity to a fee of $136,000.[14] *See Hensley*, 461 U.S. at 436–37

---

[14] Absent the reduction, the full amount requested for this period would total $442,805. The Court has reduced the request by approximately 30% for duplication and 40% for the other factors, primarily its evaluation of time spent on unsuccessful claims and issues and DENC's overall success. While the Court has given only minimal weight to the evidence about the fees charged by defense counsel for many reasons, the Court notes that with the reduction imposed, the fee awarded does end up as roughly equivalent to what defense counsel charged for the same general time frame.

(recognizing the court's discretion to either "attempt to identify specific hours that should be eliminated," or to "simply reduce the award," such as by a percentage); *accord*, *e.g.*, *Mercer*, 401 F.3d at 209.[15]  This, plus the full lodestar of fees and costs for the initial period through September 4, 2018, totals $221,455.49.

Based on the Court's detailed review of the invoices, this amount takes into account the significant duplication of effort during discovery and briefing, the time spent on unsuccessful and unrelated claims, and the degree of overlap between the successful Chapter 75 claim and the other successful claims for which there is no fee-shifting.  It is sufficient to fully reimburse DENC for its fees on the successful Chapter 75 claim, and it satisfies the public policy goal of encouraging insurance policies to write comprehensible denial letters focusing on actual policy language and facts.

## CONCLUSION

Philadelphia breached its contract with its insured when it wrongfully denied DENC's claim for coverage of the loss associated with the collapsed breezeway, and Philadelphia violated Chapter 75 by sending a deceptive denial letter to DENC.  This violation was willful, and Philadelphia engaged in an unwarranted refusal to resolve the matter for nearly two years, until its first reasonable settlement offer for some 25% over DENC's contract damages on December 18, 2019.  The Court exercises its discretion to grant attorneys' fees and costs to DENC in the amounts noted *supra* to fully reimburse

---

[15] The block-billing by DENC's counsel would also make an hour-by-hour reduction difficult, if not impossible.

DENC for fees incurred to prosecute the successful Chapter 75 claim and to fulfill

Chapter 75's statutory purpose of deterring deceptive conduct by insurers.

It is **ORDERED** that the plaintiff's motion for attorneys' fees, Doc. 75, is

**GRANTED in part,** and the defendant Philadelphia Indemnity Insurance Company shall

pay the plaintiff the sum of $221,455.49 pursuant to N.C. Gen. Stat. § 75-1.16.

It is further **ORDERED** that the parties shall confer as to the form of a judgment

that fully resolves all disputed issues in this case consistent with the Court's rulings and

shall submit a proposed judgment or proposed judgments, in Word format, to the Court's

case manager within ten days.

This the 13th day of April, 2020.


UNITED STATES DISTRICT JUDGE